STATE OF NEVADA, William Molini, Administrator for Nevada Division of Wildlife and Michael C. Spencer, Rich Ellington, and Bill Fitzmorris, as Nevada State Wildlife Wardens and Individually, Plaintiffs,

v.

Floyd HICKS, Tribal Court In and For the Fallon Paiute–Shoshone Tribes, Honorable Joseph Van Walraven, Defendants.

No. CV–N–94–351–DWH.

United States District Court,
D. Nevada.

Sept. 30, 1996.

---

C. Wayne Howle, Deputy Attorney General, Carson City, NV, for plaintiffs.

Raymond Rodriguez, Carson City, NV, and Joseph Van Walraven, Reno, NV, for defendant Paiute–Shoshone Tribes.

Melody L. McCoy, Boulder, CO, and Joseph Van Walraven, Reno, NV, for Fallon Paiute–Shoshone Tribes.

### MEMORANDUM DECISION AND ORDER

HAGEN, District Judge.

Before the court are the parties' cross-motions for summary judgment (# # 33,34,35)[1]. For the reasons stated below, plaintiffs' motion for summary judgment (# 33) is denied. Floyd Hicks's and the tribal defendants' motions for summary judgment (# # 34,35) are granted.

*Background: Facts[2] Leading To The Underlying Litigation*

In August 1990, Michael Spencer, a state game warden, applied to the New River Justice Court in Fallon, Nevada for a search warrant to search the premises of Floyd Hicks, a resident of the Fallon–Paiute Shoshone reservation.

Spencer's affidavit averred the purpose of the warrant was to obtain evidence of Possessing or Killing a Big Horn Sheep, in violation of N.R.S. 501.376, a gross misdemeanor. The affidavit also stated: (1) in January of 1989, a confidential informant advised Spencer, a state game warden, that in June of 1988 he saw two dead big horn sheep in the back of a pickup truck owned by Floyd Hicks; (2) the confidential informant also advised that Hicks admitted to possessing the sheep and planning to take them to a taxidermist in Fallon; (3) at 1:00 p.m. on August 30, 1990, Spencer was advised by a special agent of the federal Bureau of Land Management that on August 29, 1990, the agent had observed one big horn sheep head protruding from the trunk of a vehicle on Mr. Hicks's premises; (4) Spencer personally observed a big horn sheep head protruding from a vehicle on Hicks's premises; and (5) no person by the name of Hicks had a current state permit, or "tag", to take big horn sheep.

On August 30, 1990, Spencer received a search warrant from the New River Justice Court to search the residence of Floyd Hicks, a tribal member, apparently on the basis of the January 1989 affidavit. The warrant provided that the issuing court lacked jurisdiction over the Fallon Paiute–Shoshone reservation and that the warrant was valid only if approved by the Fallon Tribal Court. At all relevant times, Hicks resided on his allotted land within the boundaries of the Fallon Paiute–Shoshone Colony and Reservation.

On August 30, 1990, Mr. Spencer sought Tribal Court approval for the warrant to be executed on the reservation. The Tribal Court, Judge Harold presiding, approved the warrant, and modified it to limit the search to the "exterior premises and any vehicles thereon." The warrant was executed on August 30, 1990. One or more mounted big horn sheep heads were removed from Hicks's residence. It was ultimately determined the trophies were not evidence of any crime or game hunting violation, and they were returned to Hicks.

---

1. In a March 29, 1996, order, these motions were denied without prejudice. The court's order provided that the filing of supplemental briefs ordered by the court would be deemed a renewal of the original summary judgment motions. All parties have filed supplemental briefs and the motions are now before the court.

2. No evidentiary hearings were held before this court. These facts are gleaned from material in the record before the court and are given as background only; they are not intended to be this court's official findings of fact.

On June 12, 1991, Spencer again applied for and received a search warrant. This warrant was executed that same day. Spencer was accompanied by tribal police officers at the time he executed both warrants. One or more mounted bighorn sheep heads were removed from Hicks's residence. Once again, it was ultimately determined the trophies were not evidence of any crime or game hunting violation, and they were returned to Hicks.

*Disputed Issues in the Underlying Litigation*

Disputed issues in the underlying litigation include, but are not limited to, the facial sufficiency of the affidavits supporting the state search warrant applications, the validity of the search warrants themselves, the legality of the tribal court orders authorizing execution of the state warrants, the reasonableness of the game wardens in relying on those orders, the reasonableness of the searches, and the reasonableness of the seizure of property belonging to Hicks.

*Procedural Background*

Plaintiffs brought this action to enjoin prosecution of two civil actions in Fallon Tribal Court against the State of Nevada, William Molini, Administrator for Nevada Division of Wildlife, and Michael C. Spencer, Rich Ellington, and Bill Fitzmorris, as Nevada State Wildlife Wardens and individually. Plaintiffs seek a declaration that the Fallon Tribal Court may not exercise jurisdiction over the State of Nevada and its officers and employees, whether in their official or individual capacities.

Hicks filed the two actions at issue here in Fallon Tribal Court; one, FT 91–034, on July 8, 1991; the other, FT 92–031, on June 22, 1992. The complaints alleged a variety of claims, including claims under the Indian Civil Rights Act, 25 U.S.C. § 1302, wrongful civil proceedings, unreasonable search and seizure, trespass to land, trespass to chattels, abuse of process, and infliction of emotional distress. By amended complaint, Hicks also claimed violation of unspecified federal and tribal civil rights. The parties have proceeded as if the federal civil rights claim alleged is a § 1983 claim for a fourth amendment violation, and for the purposes of the motions before the court, the court assumes a § 1983 claim is included. Presumably, the tribal civil rights claims are asserted under ICRA.

Hicks originally attempted service by certified mail. The defendants moved to quash service of process on the grounds of state sovereign immunity, limited immunity, and defective service. On May 3, 1993, the tribal court, Judge Van Walraven presiding, ruled that it was adopting NRCP 4 for the duration of the Hicks litigation. On May 5, 1993, the court recognized plaintiffs' ineffective service argument and quashed service of process upon the state defendants. On May 21, 1993, the court authorized service by publication. Mr. Hicks published. The state then renewed its motion to quash and on February 2, 1994, the court again quashed service. The Intertribal Appellate Court, in a May 13, 1994, decision, reversed and remanded to the Fallon Tribal Court for trial. On June 1, 1994, plaintiffs filed this action in federal court.

On June 16, 1994, Judge Van Walraven issued orders staying each of Hicks's actions pending final resolution of the issue of tribal jurisdiction in federal court. Because the stay orders effectively mooted plaintiffs' motion in this court for preliminary injunction, on June 20, 1994, plaintiffs stipulated to voluntary withdrawal of that motion, and this court entered an order to that effect (# 18).

The Tribe, via resolution of the Fallon Business Council, has waived the sovereign immunity of the tribal defendants, i.e., the Tribal Court and Judge Walraven, for the limited purpose of defending, in this federal court action, plaintiffs' claims for declaratory relief regarding the issue of tribal court jurisdiction. Fallon Business Council Resolution No. 94–F–074.

■ The state defendants, the tribal defendants, and Floyd Hicks have each moved for summary judgment on the issue of the tribal court's jurisdiction over the state defendants under federal law. (# 33,34,35). Pursuant to agreement of all parties, this case is presented to the court on cross-motions for summary judgment. On October 10, 1995, the Tribal Court granted plaintiff's motions to voluntarily dismiss the state de-

fendants in their official capacities from FT 91–034 and FT 92–031. This court ruled (# 55) that these dismissal orders of the Tribal Court have mooted the issue of tribal court jurisdiction over the state defendants in their official capacities [3].

Oral argument on the summary judgment motions was presented to the court on October 16, 1995, and the motions were submitted on that date. On March 29, 1996, the court issued an order (# 55) denying, without prejudice, all three motions for summary judgment (# # 33,34,35) and ordering supplemental briefing. The order specified that submission of supplemental briefs would be deemed a renewal of the summary judgment motions. Each party has submitted supplemental briefs and the motions (# # 33,34, and 35) are deemed renewed and ripe for decision.

3. Plaintiffs argued for summary judgment in favor of the state officials on the grounds of sovereign immunity. In light of *Nevada v. Hall*, 440 U.S. 410, 99 S.Ct. 1182, 59 L.Ed.2d 416 (1979), it is far from clear that sovereign immunity would provide a basis for summary judgment in plaintiffs' favor. However, this issue has been mooted by Hicks' voluntary dismissal of the official capacity claims against the state officials. At oral argument, counsel for the State of Nevada cited *Native Village of Noatak v. Blatchford*, 38 F.3d 1505 (9th Cir.1994), for the proposition that voluntary cessation of illegal conduct does not render moot a challenge to that activity. Thus, counsel argued, the court should reconsider its conclusion that the sovereign immunity issue is now moot. The court is unpersuaded. In *Blatchford*, a challenge to an Alaska statute was mooted by the statute's repeal. The case analyzed two exceptions to the mootness doctrine. One, "capable of repetition yet evading review", allows resolution of an otherwise moot legal issue when there is a reasonable likelihood that the plaintiff will again be subject to the same injury, and the injury suffered is of a type "inherently limited in duration such that it is always likely to become moot before federal court litigation is completed." *Id.* at 1509. The second exception to the mootness doctrine, "voluntary cessation", applies when a defendant voluntarily ceases improper conduct in response to a lawsuit but the plaintiff has a reasonable expectation that the illegal action will recur. *Id.* at 1511. Neither of the two exceptions are applicable to this case. A suit brought in tribal court against the State of Nevada and state officials acting in their official capacities does not fall within the "capable of repetition yet evading review" exception because no likelihood of repeat litigation has been shown and such a suit is not inherently limited in duration such that it is always likely to

*Personal Jurisdiction Over State Defendants in Their Individual Capacities: Due Process and the Question of Service*

Any question regarding tribal court jurisdiction over the state defendants in their official capacity is moot. *See* (# 55); *see also supra* note 3. Therefore, the court will only address those arguments made by the parties with reference to the individual capacity claims.

As a preliminary matter, the court agrees with the analysis of the Intertribal Court of Appeals on the issue of service of process [4]. The Intertribal Court identified the issue as one of federal constitutional due process, and reversed the order quashing service on the grounds that service was in accordance with tribal law as adopted by Judge Van Walraven [5], and that *Mullane's* due process notice

become moot before federal court litigation is completed. Nor would such a suit fall within the "voluntary cessation" exception, as the state has made no showing of a reasonable expectation that the suit against the state defendants will be reinstated. The mere fear of a possible future injury is insufficient to invoke the "voluntary cessation" exception; "federal courts are not authorized to address such theoretical possibilities." *Id.* at 1510.

4. Although the parties have not addressed themselves to the propriety of service in their arguments to this court, the court finds it necessary and appropriate to address it because it was one of the bases upon which the Intertribal Court found tribal jurisdiction.

5. At a March 3, 1993 hearing on the first motion to quash, Judge Van Walraven noted that the jurisdictional provisions of the Fallon Tribes Law and Order Code did not provide for any specific method of service of process outside the exterior boundaries of the reservation. On March 4, 1993, Hicks petitioned the court for an order allowing service by publication. On May 5, 1993, Judge Van Walraven quashed service, stating, in part, "[t]here being no proof of service on file showing that the Court's service of the specially appearing defendants was made on the Fallon Indian Reservation or Colony, or in accordance with Nevada Rules of Civil Procedure (NRCP), Rule 4, adopted by Tribal Law, service on the specially appearing State defendants by Certified U.S. Mail fails."

Pursuant to Fallon Tribes Law and Order Code § 1–30–040, tribal judges are empowered to use the Nevada Rules of Civil Procedure as a guide as long as such use does not "impede the admin-

requirement was satisfied. *Mullane v. Central Hanover Bank & Trust Co.*, 339 U.S. 306, 70 S.Ct. 652, 94 L.Ed. 865 (1950).

The Intertribal Court found service by publication to be proper and effective under both tribal and federal constitutional law. The court reasoned that Judge Van Walraven was authorized by the tribal code to adopt provisions of NRCP as a guide, he had in fact adopted NRCP 4 in the Hicks case, he had judicial power to interpret tribal law as codified in the Law and Order Code and as adopted pursuant to the Code in his court, and the Nevada courts' interpretations of NRCP 4 are not binding on the tribal court because the "meld" of adopted Nevada procedural rule in combination with the Law and Order Code and other sources of tribal law produces a unique and valid result. The court further held that Judge Van Walraven's order adopting NRCP 4 was not subject to post-hoc oral modification after Hicks relied on it [6].

■■■ Plaintiffs have not persuaded this court that the Intertribal Court of Appeals decided this issue erroneously. This court defers to tribal court determinations of tribal law unless they implicate substantial federal questions. *Hinshaw v. Mahler*, 42 F.3d 1178 (9th Cir.1994), *cert. denied,* — U.S. —, 115 S.Ct. 485, 130 L.Ed.2d 398 (1994). The only substantial federal question implicated in the court's ruling on service is that of due process. The Intertribal Appeals Court decided this issue correctly. In the leading case on due process in the service context, *Mullane v. Central Hanover Bank & Trust Co.*, the Supreme Court stated,

> An elementary and fundamental requirement of due process in any proceeding which is to be accorded finality is notice reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections. The notice must be of such nature as reasonably to convey the required information and it must afford a reasonable time for those interested to make their appearance. But if due respect for the practicalities and peculiarities of the case these conditions are reasonably met the constitutional requirements are satisfied. 339 U.S. 306, 314–15, 70 S.Ct. 652, 657, 94 L.Ed. 865 (1950).

The "practicalities and peculiarities" of this case include the following: the complaint in CV–FT–034 was stamped "service made and accepted this 16th day of July 1991" and signed by Sherry Porter, Deputy Attorney General; the individual defendants were initially served by certified mail sent out by the court itself; the defendants had actual notice as evidenced by their special appearance to quash service; and service by publication was expressly authorized by the tribal court. No reasonable argument can be made that on the facts in this case, defendants did not receive notice reasonably calculated to apprise them of the action and give them an opportunity to be heard, that they were not afforded reasonable time to make an appearance, or that necessary information was not conveyed. The court finds that service met with the constitutional due process requirements of *Mullane.*

■■■ Furthermore, the court finds that by executing the search warrant on the premises of Hicks's allotment [7], the individual game warden defendants purposefully availed themselves of the privilege of conducting activities within the exterior boundaries of the reservation and on tribal land. *See Hanson v. Denckla,* 357 U.S. 235, 78 S.Ct. 1228, 2 L.Ed.2d 1283 (1958). *See also Merrion v. Jicarilla Apache Tribe,* 455 U.S. 130, 144–45, 102 S.Ct. 894, 905, 71 L.Ed.2d 21 (1982) ("Nonmembers who lawfully enter tribal

---

istration of justice nor contravene the application of any Tribal law or custom of federal law nor to produce any absurd result nor impose any regulatory scheme or policy not contemplated by the Tribe nor to interfere with the Tribe's law or policies on any subject regulated by the Tribe." Although the May 5, 1993, order is somewhat ambiguous, the court's May 21, 1993, order clarifies that the court had adopted NRCP 4.

**6.** Hicks also relied on the court's order allowing service by publication.

**7.** These facts are adequately established by the record and are not disputed by the parties.

lands remain subject to the tribe's power ... to place conditions on entry, on continuous presence, or on reservation conduct ... A nonmember who enters the jurisdiction of the tribe remains subject to the risk that the tribe will later exercise its sovereign power."). Clearly, the dispute arises out of those contacts. Thus, as a matter of due process, the court finds the exercise of personal jurisdiction to comport with "fair play and substantial justice." *Burger King Corp. v. Rudzewicz,* 471 U.S. 462, 477–78, 105 S.Ct. 2174, 2185, 85 L.Ed.2d 528 (1985).

*Exhaustion of Tribal Remedies*

In *National Farmers Union Insurance Cos. v. Crow Tribe of Indians*[8], the Court held that "[t]he question whether an Indian tribe retains the power to compel a non-Indian property owner to submit to the jurisdiction of a tribal court is one that must be answered by reference to federal law." 471 U.S. 845, 852, 105 S.Ct. 2447, 2452, 85 L.Ed.2d 818 (1985). However, the Court, emphasizing the Congressional "policy of supporting tribal self-government and self-determination", the desirability of developing a full record prior to federal review, and the goal of enhancing the legitimacy of tribal courts, required exhaustion of tribal court remedies before a federal court could hear a challenge to "either the merits or any question concerning appropriate relief." *Id.,* at 856, 105 S.Ct. at 2454.

In *Iowa Mutual Insurance Co. v. La-Plante*[9], citing *Merrion v. Jicarilla Apache Tribe*[10], the Court emphasized that a tribe retains all the inherent attributes of sovereignty not previously invalidated by federal law. The Court stated, "[c]ivil jurisdiction over [activities of non-Indians on reservation lands] presumptively lies in the tribal courts unless affirmatively limited by a specific treaty provision or federal statute." 480 U.S. 9, 18, 107 S.Ct. 971, 977, 94 L.Ed.2d 10 (1987).

*National Farmers* and *Iowa Mutual* "place a strict premium on precise and rigorous tribal court analysis of its own jurisdictional parameters." Frank R. Pommersheim, *The Crucible of Sovereignty: Analyzing Issues of Tribal Jurisdiction,* 31 Ariz.L.Rev. 329, 331 (1989). The crucial questions for the tribal court are (1) whether the tribal court is empowered by tribal law to hear a particular kind of case; and (2) whether tribal court authority is limited by federal law. The Court in *National Farmers* described the necessary analysis as requiring "a careful examination of tribal sovereignty, the extent to which that sovereignty has been altered, divested or diminished, as well as a detailed study of relevant statutes, Executive Branch policy as embodied in treaties and elsewhere, and administrative or judicial decisions." *National Farmers,* 471 U.S. 845, 855–56, 105 S.Ct. 2447, 2453–54.

Thus, the extent to which tribal law authorizes jurisdiction is a question which should be answered by the tribal court in the first instance. In this case, the Intertribal Court of Appeals definitively answered this question. While admittedly the Court did not memorialize its reasoning in the historical depth and legal detail contemplated by *National Farmers,* the parties have exhausted their tribal remedies and the matter is now properly before this court.

*Tribal Civil Adjudicatory Jurisdiction, Generally*

The contours of tribal civil adjudicatory jurisdiction over in Indian country are unclear for several reasons. No federal statutes provide guidance. The federal caselaw, while clearly mandating exhaustion of tribal remedies in the first instance, "fails to establish clear-cut guidelines for deciding in what circumstances tribal court jurisdiction is appropriate." Pommersheim, 331. However,

---

**8.** 471 U.S. 845, 105 S.Ct. 2447, 85 L.Ed.2d 818 (1985). In *National Farmers,* a Crow Indian injured in a motorcycle accident in a school parking lot on fee land within the Crow Indian Reservation sued a state school district in tribal court. The school district's insurance company sought to collaterally attack a default judgment against it in federal court.

**9.** 480 U.S. 9, 107 S.Ct. 971, 94 L.Ed.2d 10 (1987).

**10.** 455 U.S. 130, 102 S.Ct. 894, 71 L.Ed.2d 21 (1982).

the Supreme Court's opinions as far back as *Worcester v. Georgia* [11] suggest that, in contrast to criminal jurisdiction, which the Court views as purely membership-based, tribal court civil jurisdiction has a strong geographic component [12]. The Ninth Circuit explicitly recognized this principle in *United States v. Plainbull*, stating "tribal courts are appropriate forums for the exclusive adjudication of disputes taking place within the boundaries of a reservation." 957 F.2d 724, 727 (9th Cir.1992) [13].

Felix Cohen, an oft-cited expert on federal Indian law, has described the backdrop against which the tribal jurisdiction analysis is conducted as follows:

> The whole course of judicial decision on the nature of Indian tribal powers is marked by an adherence to three fundamental principles: (1) An Indian tribe possesses, in the first instance, all the power of any sovereign state. (2) Conquest renders the tribe subject to the legislative power of the United States and, in substance, terminates the external powers of the sovereignty of the tribe, e.g., its power to enter into treaties with foreign nations, but does not by itself affect the internal sovereignty of the tribe, i.e., its powers of local self-government. (3) These powers are subject to qualification by treaties and by express legislation of Congress, but save as thus expressly qualified, full powers of internal sovereignty are vested in the Indian tribes and in their duly constituted organs of government.

F. Cohen, Handbook of Federal Indian Law 123 (1942 ed.).

The continuing application of these overriding principles is readily gleaned from subsequent Supreme Court caselaw. In *Williams v. Lee*, a suit brought against a Navajo defendant by a non-Indian owner of a store on the Navajo reservation, the Court held that the state court lacked jurisdiction over the dispute. 358 U.S. 217, 79 S.Ct. 269, 3 L.Ed.2d 251 (1959). The Court reasoned that allowing state court jurisdiction over disputes arising on the reservation and involving significant tribal interests would "undermine the authority of the tribal courts over Reservation affairs and hence would infringe upon the right of the Indians to govern themselves." *Id.*, at 223, 79 S.Ct. at 272.

In *Santa Clara Pueblo v. Martinez*, 436 U.S. 49, 98 S.Ct. 1670, 56 L.Ed.2d 106 (1978), the Court held the Indian Civil Rights Act (ICRA) does not provide a civil cause of action in federal court [14], reasoning that because "tribal forums are available to vindicate rights created by the ICRA", an implied federal right of action was unnecessary. The Court cited *Williams v. Lee* for the proposition that "[t]ribal courts have been recog-

---

11. 31 U.S. (6 Pet) 515, 556, 8 L.Ed. 483 (1832). In this opinion, Chief Justice Marshall described the Indian tribes as "distinct political communities, having territorial boundaries, within which their authority is exclusive." The Supreme Court has since rejected this absolute rule of exclusive jurisdiction, *see Oliphant v. Suquamish Tribe*, 435 U.S. 191, 212, 98 S.Ct. 1011, 1022–23, 55. L.Ed.2d 209 (1978), but territory remains a determining factor in many jurisdictional determinations.

12. *See* Allison M. Dussias, *Geographically–Based and Membership Based Views of Indian Tribal Sovereignty: The Supreme Court's Changing Vision*, 55 U.Pitt.L.Rev. 1 (1993); *see also Williams v. Lee*, 358 U.S. 217, 223, 79 S.Ct. 269, 272, 3 L.Ed.2d 251 (1959) ("[Respondent] was on the Reservation and the transaction with an Indian took place there. The cases in this Court have consistently guarded the authority of Indian governments over their reservations ... If this power is to be taken away from them, it is for Congress to do it."; *Iowa Mutual Ins. Co. v.*

*LaPlante*, 480 U.S. 9, 18, 107 S.Ct. 971, 977–78, 94 L.Ed.2d 10 (1987) (Tribal jurisdiction over tribal territory exists unless specifically divested or diminished by Congress).

13. The court, citing *Santa Clara Pueblo v. Martinez*, 436 U.S. 49, 65, 98 S.Ct. 1670, 1680–81, 56 L.Ed.2d 106 (1978), *Williams v. Lee*, 358 U.S. 217, 79 S.Ct. 269, 3 L.Ed.2d 251 (1959), and *Iowa Mutual v. LaPlante*, 480 U.S. 9, 15, 107 S.Ct. 971, 976, 94 L.Ed.2d 10 (1986), stated, "[d]eference to tribal courts with regard to tribal affairs is a fundamental tenet of federal jurisprudence." *Id.*, at 728. The court referred once again to "activities occurring inside reservation boundaries" before concluding "[b]ecause the Plainbulls grazed their cattle on reservation land without obtaining a tribal permit", and "the alleged trespass was to tribal land", plaintiffs should have filed in tribal court. *Id.*

14. The only federal remedy expressly made available under ICRA is the writ of habeas corpus.

**1464**

nized as appropriate forums for the exclusive adjudication of disputes affecting important personal and property rights of both Indians and non-Indians." *Id.*, at 65, 98 S.Ct. at 1680–81.

### Jurisdiction Over State Defendants In This Case

■ Here, the tribal court has asserted jurisdiction, and the Intertribal Court of Appeals has affirmed. A tribal court's interpretation of tribal law is binding on this court. *Hinshaw v. Mahler*, 42 F.3d 1178 (9th Cir. 1994). However, the extent of tribal court jurisdiction is a federal question. *National Farmers*, 471 U.S. 845, 105 S.Ct. 2447, 85 L.Ed.2d 818 (1985). *Hinshaw* precludes a federal court from second-guessing a tribal court's own reading of tribal law, while *National Farmers* reserves the ultimate decision on tribal jurisdiction to federal courts. These two principles require federal courts to determine *de novo* whether the tribal court has asserted its jurisdiction beyond lawful limits; the applicable limits are those set by federal law. *National Farmers*, 471 U.S. 845, 105 S.Ct. 2447, 85 L.Ed.2d 818 (1985). Thus, the questions for this court are whether the Intertribal Court of Appeals erred, as a matter of federal Indian law, in holding that the tribal court properly exercised jurisdiction over the underlying litigation in the first instance.

### Montana v. United States, the Presumption of Retained Sovereignty, and the Rule of Implicit Divestiture

Defendants argue that because the underlying events occurred on tribal territory, this court must presume the tribe possesses inherent sovereign jurisdiction until plaintiffs rebut the presumption with a showing of express divestiture by Congress; they further argue that plaintiffs have not and cannot make that showing. In contrast, plaintiffs argue the presumption urged by defendants does not apply because under *Montana v. United States*, the power of civil adjudication over a person not a member of the tribe has been implicitly divested as inconsistent with the tribe's status as a domestic dependent nation. The resolution of this dispute requires an examination of the nature and applicability of the Supreme Court's holding in *Montana v. United States*, 450 U.S. 544, 101 S.Ct. 1245, 67 L.Ed.2d 493 (1981).

In *Montana*, the Supreme Court held the dependent status of Indian tribes implicitly divested them of power to regulate the conduct of non-members on fee land no longer owned by the tribe. However, the opinion carefully reiterated that tribes retain significant civil jurisdiction over non-Indians on their reservations:

> A tribe may regulate, through taxation, licensing, or other means, the activities of nonmembers who enter consensual relationships with the tribe or its members, through commercial dealing, contracts, leases, or other arrangements. A tribe may also retain inherent power to exercise civil authority over the conduct of non-Indians on fee lands within its reservation when that conduct threatens or has some direct effect on the political integrity, the economic security, or the health and welfare of the tribe. *Id.*

Although *Montana* recognized the existence of retained [15] sovereignty, it appeared to sharply curtail the scope of that sovereignty. The Court set forth a "general proposition that the inherent sovereign powers of an Indian tribe do not extend to the activities of nonmembers of the tribe" and further stated that tribal sovereignty over nonmembers "cannot survive without express congressional delegation." 450 U.S. at 564, 101 S.Ct. at 1258. This broad language seemed to inexplicably reverse the traditional presumption set forth in *Williams v. Lee*, which stated "[t]his court has consistently guarded the authority of Indian governments over their reservations ... [i]f this power is to be taken away from them, it is for Congress to do it." 358 U.S. 217, 223, 79 S.Ct. 269, 272, 3 L.Ed.2d 251 (1959). In other words, whereas *Williams* presumes tribal power unless di-

---

**15.** The Supreme Court recognizes adjudicatory jurisdiction as an element of "retained" sovereignty even though "tribal courts in the Anglo-American mold were [historically] virtually unknown". *See Iowa Mutual v. LaPlante*, 480 U.S. 9, 17, 107 S.Ct. 971, 977, 94 L.Ed.2d 10 (1987).

vested [16], *Montana* appears to presume power over nonmembers has been lost, unless one of the two specified exceptions applies.

No Supreme Court case explains the reversal of the *Williams* presumption, and post-*Montana* cases have followed the *Montana* rule inconsistently, if at all. An opinion handed down shortly before *Montana, Washington v. Confederated Tribes of the Colville Indian Reservation,* stated "[t]ribal powers are not implicitly divested by virtue of the tribes' dependent status." 447 U.S. 134, 153, 100 S.Ct. 2069, 2081, 65 L.Ed.2d 10 (1980). In a case decided one year after the *Montana* decision, *Merrion v. Jicarilla Apache Tribe,* the Court, expressly rejecting an implicit divestiture argument, held that the power to impose a severance tax on oil and gas extracted from tribal lands by nonmember lessees was inherent in the tribe's power as a sovereign nation. 455 U.S. 130, 144, 149–50, 102 S.Ct. 894, 905, 908, 71 L.Ed.2d 21 (1982). *National Farmers* and *Iowa Mutual,* both post-*Montana* cases, reiterate the presumption of retained sovereignty, without any attempt to reconcile these formulations with *Montana's* apparent reversal of the *Williams* presumption. However, more recent cases have returned to *Montana. See*

*Brendale v. Confederated Tribes and Bands of the Yakima Indian Nation,* 492 U.S. 408, 425, 109 S.Ct. 2994, 3005, 106 L.Ed.2d 343 (1989); *South Dakota v. Bourland,* 508 U.S. 679, 685–87 n. 6, 113 S.Ct. 2309, 2315 n. 6, 124 L.Ed.2d 606 (1993).

Because *Montana, Brendale,* and *Bourland* involved challenges to a tribe's power to regulate, and *National Farmers* and *Iowa Mutual* involved challenges to a tribe's power to adjudicate tort claims against a nonmember, the different formulations of the "general rule" may be a result of the Supreme Court's implicit recognition of a principled distinction between tribal adjudicatory jurisdiction and tribal regulatory jurisdiction [17]. The Ninth Circuit made this distinction in its *National Farmers* opinion, but the Supreme Court did not address it. *Compare National Farmers Union Ins. v. Crow Tribe,* 736 F.2d 1320, 1321 n. 3, 1323 and n. 4 (9th Cir.1984) *with National Farmers Union Ins. v. Crow Tribe,* 471 U.S. 845, 105 S.Ct. 2447, 85 L.Ed.2d 818 (1985). Several commentators have argued persuasively that a distinction between tribal regulatory and adjudicatory jurisdiction has been reflected, albeit implicitly, in the Supreme Court's opinions.[18]

---

**16.** *Williams v. Lee* recognized the authority of tribal courts over Reservation affairs involving nonmembers. 358 U.S. 217, 79 S.Ct. 269, 3 L.Ed.2d 251 (1959). In *United States v. Wheeler,* the Court held that Indian tribes possessed those aspects of sovereignty not withdrawn by treaty, statute or by implication as a necessary result of their status as domestic dependent nations. 435 U.S. 313, 98 S.Ct. 1079, 55 L.Ed.2d 303 (1978). Later, in *Oliphant,* the Court utilized the new *Wheeler* doctrine of implicit divestiture, which severely eroded the *Williams v. Lee* presumption, to invalidate tribal criminal jurisdiction over nonmembers. 435 U.S. 191, 98 S.Ct. 1011, 55 L.Ed.2d 209 (1978). In *National Farmers,* the Supreme Court rejected the claim that implicit divestiture extends to civil adjudicatory jurisdiction over nonmembers. And, in *Iowa Mutual,* the Court, noting that Congress had never expressed an intent to limit the civil jurisdiction of the tribal courts, stated that jurisdiction is presumed unless affirmatively limited by treaty or federal statute.

**17.** "[Regulatory, or legislative, jurisdiction] refers to the authority of a state to make its law applicable to persons or activities and is quite a separate matter from jurisdiction to adjudicate." *Hartford Fire Ins. Co. v. California,* 509 U.S. 764, 813, 113 S.Ct. 2891, 2918, 125 L.Ed.2d 612

(1993) (Scalia, J., dissenting) (internal citations omitted).

**18.** *See, e.g., Laurie Reynolds, Exhaustion of Tribal Remedies: Extolling Tribal Sovereignty While Expanding Federal Jurisdiction,* 73 N.C.L.Rev. 1089, 1128–29, 1141–49 (1995). Reynolds points out that federal courts have entertained challenges to tribal regulatory jurisdiction since *Johnson v. M'Intosh,* 21 U.S. (8 Wheat.) 543, 5 L.Ed. 681 (1823), but had not heard a challenge to a tribe's adjudicatory jurisdiction until *National Farmers* in 1985. In that opinion, the Court announced the rule that all challenges to tribal jurisdiction, both regulatory and adjudicatory, are federal questions.

*See also,* Joseph Singer, *Remembering What Hurts Us Most: A Critique of the American Indian Law Deskbook,* 24 N.M.L.Rev. 315, 316–17, 325–27 (1994). Professor Singer criticizes the *Deskbook,* a treatise by a group of Attorneys General from western states, for "advancing [the Attorneys General's] own political agenda by relying on the narrower view of sovereignty put forth in the legislative jurisdiction cases [*Montana, Brendale* and *Duro v. Reina* ], while ignoring the Court's endorsement of tribal sovereignty as reflected in *National Farmers* and *Iowa Mutual.*" Reynolds, 73 N.C.L.Rev. 1098, 1157 n. 277.

The recognition of this distinction would resolve the apparent inconsistency between the Supreme Court's formulation of the rule in *National Farmer's* and *Iowa Mutual,* which trumpeted a vital presumption of retained jurisdiction unless a challenger proved divestment, and the arguably narrower *Montana* view of sovereignty.

### Yellowstone County v. Pease

In *Yellowstone County v. Pease*[19], the Ninth Circuit cited with approval a portion of the Eighth Circuit's *en banc* opinion in *A–1 Contractors v. Strate*[20], integrating the *Montana* rule with the presumption of retained sovereignty as reiterated in *Iowa Mutual* and other cases, into one coherent rule:

> A valid tribal interest must be at issue before a tribal court may exercise civil jurisdiction over a ... nonmember, but once the tribal interest is established, a presumption arises that tribal courts have jurisdiction over the ... nonmember unless that jurisdiction is affirmatively limited by federal law. *Pease,* 1996 WL 512363, 512366 [96 F.3d 1169] (9th Cir.), quoting from *A–1 Contractors,* 76 F.3d 930, 938–39 (8th Cir.1996) (*en banc* ).

### Montana

If the rule in *A–1 Contractors* is now indeed the law of the Ninth Circuit, it certainly provides a helpful framework. However, it does not significantly alter this court's analysis in this case. Under either the *A–1 Contractors* formulation or under *Montana,* the court finds tribal jurisdiction properly asserted. Assuming, *arguendo,* the *Montana* rule controls, the court finds *Montana* does not preclude tribal jurisdiction in this case.

■ As a threshold matter, the court notes that the *Montana* decision involved the tribe's jurisdiction over fee lands within reservation boundaries. A finding of implicit divestiture of tribal authority over conduct occurring on land no longer owned by the tribe[21] and which has not been demonstrated to "threaten or have some direct effect on the political integrity, the economic security, or the health and welfare of the tribe" has limited application to the issue presented here.

Providing a forum for reservation-based tort actions, even where constitutional torts are alleged, falls within both *Montana* exceptions. Mr. Hicks, a member of the Tribe, has alleged his federal civil rights were violated on tribal land. The tribal code provides for jurisdiction over all civil causes of action arising within the territorial jurisdiction of the court, and specifies that entry upon such territory constitutes consent to the jurisdiction of the court. Furthermore, tribal law provided very specific restrictions on the execution of extraterritorial search warrants on the reservation. These tribal law provisions are directly applicable to the facts in this case and clearly show that the tribe viewed the execution of state search warrants on the reservation as bearing directly on the political integrity of the tribe. *See Montana,* 450 U.S. 544, 101 S.Ct. 1245, 67 L.Ed.2d 493 (1981). By enacting such provisions, the tribe has asserted its interest in adjudicating such disputes.

■ Even without tribal statutory law in this area, this court would presume that the Tribe has an interest in providing Mr. Hicks, and any other tribal member similarly situated, a forum in which to vindicate these rights. As recognized by the Supreme Court in *National Farmers,* tribal self-gov-

---

The Ninth Circuit has recently expressed skepticism about the existence of an adjudicatory/regulatory distinction. *See Yellowstone County v. Pease,* 96 F.3d 1169 (9th Cir.1996). However, the court previously recognized the distinction in *National Farmers, see* 736 F.2d 1320, 1321 n. 3, 1323 and n. 4 (9th Cir.1984), and has not subsequently held the distinction invalid.

**19.** 96 F.3d 1169 (9th Cir.).

**20.** 76 F.3d 930, 938–39 (8th Cir.1996).

**21.** *Montana*'s holding prohibiting regulation of nonmember hunting and fishing on fee lands owned by nonmembers rested on findings that (1) property rights in the river bed had never been conveyed to the tribe by the United States; and (2) no clear relationship to tribal self-government existed because the riparian land was no longer owned by the tribe. In contrast, in this case, the parties do not dispute that the events at issue here occurred on land allotted to Mr. Hicks, a member of the tribe, and within reservation boundaries.

ernment and self-determination are inextricably linked to the continuing enhancement of the legitimacy of the tribal courts. 471 U.S. 845, 856, 105 S.Ct. 2447, 2453–54, 85 L.Ed.2d 818 (1985). Furthermore, the tribal courts' legitimacy should not be measured solely by how closely it approximates the operation of the federal courts [22], or how exactly its adjudications correspond with federal or state caselaw. "If the word "sovereign" has any meaning in contemporary federal courts' jurisprudence, its meaning comes from a state's or tribe's ability to maintain different modes from the federal government." Judith Resnik, *Dependent Sovereigns: Indian Tribes, States, and the Federal Courts*, 56 U.Chi.L.Rev. 671, 749 (1989). Tribal courts must be permitted to be "jurisgenerative" if they are to thrive. *See id.,* 751 (citing Robert Cover, *Nomos and Narrative,* 97 Harv.L.Rev. 4, 28). "If justice is a product of conversation rather than unilateral declaration, it is more likely to be achieved in the context of respectful dialogue rather than majoritarian conclusions about the 'other'." Frank Pommersheim, *Braid of Feathers* 193 (1995).

Although the issue presented here is one of first impression, the court is satisfied that this ruling is consistent with the federal caselaw. Ninth Circuit law has not found *Montana* to restrict tribes' adjudicatory jurisdiction over non-members. To the contrary, the Ninth Circuit cases reaffirm the concept of retained sovereignty as restated in *Iowa Mutual* and *National Farmers. See, e.g., Hinshaw v. Mahler,* 42 F.3d 1178 (9th Cir.1994); *FMC v. Shoshone–Bannock Tribes,* 905 F.2d 1311 (9th Cir.1990), *cert. denied,* 499 U.S. 943, 111 S.Ct. 1404, 113 L.Ed.2d 459 (1991); *Wellman v. Chevron U.S.A., Inc.,* 815 F.2d

577 (9th Cir.1987); *Yellowstone County v. Pease,* 96 F.3d 1169 (9th Cir.1996).

■ The presence of federal law issues in the tribal court litigation does not compel the conclusion that tribal court jurisdiction may not lie. *See Middlemist v. Lujan,* 824 F.Supp. 940 (D.Mont.1993), *aff'd without opinion,* 19 F.3d 1318 (9th Cir.1994), *cert. denied,* —— U.S. ——, 115 S.Ct. 420, 130 L.Ed.2d 335 (1994). *See also Iowa Mutual Ins. Co. v. LaPlante,* 480 U.S. 9, 16, 107 S.Ct. 971, 976, 94 L.Ed.2d 10 (1987) ("[U]nconditional access to the federal forum would place it in direct competition with the tribal courts, thereby impairing the latter's authority over reservation affairs."); *Altheimer & Gray v. Sioux Mfg. Co.,* 983 F.2d 803, 814 (7th Cir. 1993), *cert. denied,* 510 U.S. 1019, 114 S.Ct. 621, 126 L.Ed.2d 585 (1993) ("[a] tribal court, presumably, is as competent to interpret federal law as it is state law"). Nor does the non-Indian status of the defendant. *Williams v. Lee,* 358 U.S. 217, 223, 79 S.Ct. 269, 272, 3 L.Ed.2d 251 (1959) ("It is immaterial that respondent is not an Indian. He was on the Reservation and the transaction took place there. The cases in this Court have consistently guarded the authority of Indian governments over their reservations ... If this power is to be taken away from them, it is for Congress to do it."); *Hinshaw v. Mahler, see also Cardin v. De La Cruz,* 671 F.2d 363, 366 (9th Cir.1982), *cert. denied,* 459 U.S. 967, 103 S.Ct. 293, 74 L.Ed.2d 277 (1982) (to hold otherwise would "reduce to a nullity the Supreme Court's repeated assertions that Indian tribes retain attributes of sovereignty over their territory, not just their members" [internal citations omitted] ).

Nor does the status of the state defendants as state actors argue persuasively against

---

22. The record indicates the Fallon Tribal Court and the Intertribal Court of Appeals follow an essentially Anglo–American mode of operation. At the October 16, 1995, summary judgment hearing, counsel for defendants represented to this court that Hicks expects federal substantive law to govern his federal law claims in the tribal court. However, these facts are not dispositive here. Many tribal court systems have exhibit a meld developed from an interaction between federal regulation and Indian tribal customs. In some tribes, federal notions of separation of powers and tripartite government are not strictly observed; "tribal councils may act as appellate bodies as well as executive decision makers ... [t]he sources of law, permissible styles of argument, and structure of the proceedings may vary substantially from what practitioners have come to expect in federal courts." Judith Resnick, *Dependent Sovereigns: Indian Tribes, States, and the Federal Courts,* 56 U.Chi.L.Rev. 671, 737 (1989). While in an extreme case, a confluence of these factors might provide a basis for overturning a final tribal court decision, neither the procedural posture nor the facts of this case make such a decision appropriate here.

jurisdiction. The Supreme Court has consistently recognized that Indian tribes retain "attributes of sovereignty over both their members and their territory", *United States v. Mazurie* [23], and that "tribal sovereignty is dependent on, and subordinate to, only the federal government, not the States." *Washington v. Confederated Tribes of Colville Indian Reservation*, 447 U.S. 134, 154, 100 S.Ct. 2069, 2081, 65 L.Ed.2d 10 (1980).

*Conclusion*

Mr. Hicks seeks a remedy for the violation of his constitutional and common law rights. He chose to seek those remedies in the Fallon Tribal Court. The Tribal Court has asserted jurisdiction over his lawsuit. State defendants point to no law, statutory or decisional, which persuades this court he cannot proceed in tribal court.

 As the Supreme Court has clearly stated, it is not the role of the federal courts to abrogate tribal sovereignty [24]. Both *National Farmers* and *Iowa Mutual* contemplated post-exhaustion federal court review of tribal jurisdictional holdings. This court reads that mandate conservatively; in the court's view, the task before it is to evaluate the tribal court's assertion of jurisdiction in light of federal Indian law as it stands today, not to create new federal common law further restricting tribal jurisdiction. The presumption is in favor of tribal court jurisdiction. *Iowa Mutual*, 480 U.S. 9, 18, 107 S.Ct. 971, 977–78, 94 L.Ed.2d 10 (1987). Implicit divestiture will not be found unless "the exercise of tribal sovereignty would be inconsistent with the overriding interests of the National Government [25]", as "when the tribes seek to engage in foreign relations, alienate their lands to non-Indians without federal consent, or [criminally] pros-

ecute non-Indians in tribal courts which do not accord the full protections of the Bill of Rights." *Washington v. Confederated Tribes of the Colville Indian Reservation*, 447 U.S. 134, 153–54, 100 S.Ct. 2069, 2081, 65 L.Ed.2d 10 (1980).

 This court has found valid tribal interests to be at issue. *See Yellowstone County v. Pease*, 96 F.3d 1169 (9th Cir.1996) (citing *A–1 Contractors v. Strate*, 76 F.3d at 938–39 (8th Cir.1996) (*en banc*)). Plaintiffs have failed to prove the jurisdiction asserted by the tribe is affirmatively limited by federal law. No express congressional divestment of the tribe's presumed inherent jurisdiction, or "an overriding federal interest that would necessarily be frustrated" by the exercise of tribal jurisdiction, has been shown. *Washington v. Confederated Tribes of the Colville Indian Reservation*, 447 U.S. at 154, 100 S.Ct. at 2081, 65 L.Ed.2d 10 (1980). Therefore, this court concludes that the Fallon Tribal Court has jurisdiction to adjudicate Hicks's claims against the state defendants in their individual capacities.

*Qualified Immunity*

Plaintiffs argue for summary judgment in favor of the state defendants in their individual capacities on several grounds. First, they argue that Hicks failed to make the requisite pleading and showing necessary to overcome the individuals' claims of qualified immunity as state officers and employees. They claim the issue was raised, argued and briefed in the tribal court proceedings, the tribal court failed to adequately address these arguments when they were presented, and erred as a matter of law by denying them immunity.

---

**23.** 419 U.S. 544, 557, 95 S.Ct. 710, 717–18, 42 L.Ed.2d 706 (1975). *See also Cardin v. De La Cruz*, 671 F.2d 363, 366 (9th Cir.1982) (to hold otherwise would "reduce to a nullity the Supreme Court's repeated assertions that Indian tribes retain attributes of sovereignty over their territory, not just their members" [internal citations omitted] ).

**24.** "Because the Tribe retains all inherent attributes of sovereignty that have not been divested by the Federal Government, the proper inference from silence . . . is that the sovereign power . . .

remains intact." *Iowa Mutual*, 480 U.S. 9, 18, 107 S.Ct. 971, 977–78, 94 L.Ed.2d 10 (1987).

**25.** These instances have thus far been limited to "when the tribes seek to engage in foreign relations, alienate their lands to non-Indians without federal consent, or [criminally] prosecute non-Indians in tribal courts which do not accord the full protections of the Bill of Rights." *Washington v. Confederated Tribes of the Colville Indian Reservation*, 447 U.S. 134, 153–54, 100 S.Ct. 2069, 2081, 65 L.Ed.2d 10 (1980).

▇ The tribal trial court held that qualified immunity did not serve as a jurisdictional bar, and the tribal appellate court affirmed. This court agrees. As a matter of federal law, qualified immunity is not a jurisdictional bar to suits against a state official in his individual capacity, but rather an affirmative defense. *See Harlow v. Fitzgerald,* 457 U.S. 800, 815, 102 S.Ct. 2727, 2736–37, 73 L.Ed.2d 396 (1982). Therefore, the court affirms the Intertribal Appellate Court's ruling on qualified immunity as a jurisdictional issue.

▇ To the extent that the parties dispute whether qualified immunity is available to the state defendants as a defense, the court finds that question was not exhausted in the tribal courts [26]. While mindful of the policy reasons behind the general rule that issues of qualified immunity ordinarily be decided long before trial, *see Hunter v. Bryant,* 502 U.S. 224, 112 S.Ct. 534, 116 L.Ed.2d 589 (1991), the court is unwilling to disregard the exhaustion rule to decide that issue. Although plaintiffs argue that the tribal court "implicitly" ruled on the defense, the court disagrees. The tribal court did not hold an evidentiary hearing or make definitive findings of fact or conclusions of law on the application of the qualified immunity defense to the facts of this case. The court held only that qualified immunity was not a jurisdictional bar to tribal court jurisdiction in the first instance.[27] Therefore, this court does not reach the issue of qualified immunity as a defense to the underlying claims. *See Crawford v. Genuine Parts Co.,* 947 F.2d 1405, 1408 (9th Cir.1991), *cert. denied,* 502 U.S. 1096, 112 S.Ct. 1174, 117 L.Ed.2d 419 (1991) ("When the dispute is a reservation affair ... there is no discretion not to defer[28]").

### Claims Against Molini

▇ At oral argument, the court questioned whether Hicks states a claim against William Molini in his individual capacity, as it appeared no specific facts were alleged as to his personal participation in the allegedly unconstitutional and tortious acts of the wardens in obtaining and executing the search warrant and seizing Hicks's property.

The voluntary dismissal of the official capacity claims by the tribal court may well have made personal and subject-matter jurisdiction over Molini in CV–FT–034 [29] inappropriate. This issue was never before the tribal court because when the motion to quash rulings were made, claims against the state defendants in their official capacities had not yet been voluntarily dismissed. Therefore, the court declines to rule on whether a claim has been stated against Molini, leaving this

26. The court stated, "The Court finds that it is not prevented by doctrines of sovereign or qualified immunity from lawfully exerting personal jurisdiction over the specially appearing State defendants." Plaintiffs concede (# 33, P.13) that this issue was not exhausted in the tribal court.

27. This court expresses no opinion as to whether it would have jurisdiction to review a tribal court determination of that issue. *National Farmers* and *Iowa Mutual* both contemplate some post-exhaustion review; however, the breadth of that review is as yet undefined. While *National Farmers*'s almost casual reference to "review on the merits" suggests that a tribal court's resolution of the underlying claims is subject to federal review, dicta in *Iowa Mutual* proposes that after tribal court resolution of the merits, the parties will be collaterally estopped from relitigating, in federal court, the legal issues in the underlying claims. *See* Laurie Reynolds, *Exhaustion of Tribal Remedies: Extolling Tribal Sovereignty While Expanding Federal Jurisdiction,* 73 N.C.L.Rev. 1089, 1119 (1995); *Iowa Mutual v. LaPlante,* 480 U.S. 9, 19, 107 S.Ct. 971, 978, 94 L.Ed.2d 10

(1987); *National Farmers Union v. Crow Tribe,* 471 U.S. 845, 856, 105 S.Ct. 2447, 2453–54, 85 L.Ed.2d 818 (1985).

Of course, the court is, in this decision, engaging in the *de novo* review of the tribal court's jurisdictional ruling clearly required by *National Farmers* and *Iowa Mutual.* However, the court notes that those two opinions seem to represent contradictory approaches to the question of post-exhaustion federal review of the substantive legal issues going to the merits of the underlying litigation.

28. *But see Iowa Mutual,* 480 U.S. 9, 16 n. 8, 107 S.Ct. 971, 976–77 n. 8 ("Exhaustion is required as a matter of comity, not as a jurisdictional prerequisite.")

29. The amended complaints, at # 37 and # 38 in the official Record, as modified by stipulation of the parties, are currently the operative complaints in the underlying tribal court actions, CV–FT–91–034 and CV–FT–91–031. Molini is a named defendant in CV–FT–91–034.

unexhausted issue to the tribal court. *See Crawford,* 947 F.2d 1405 (9th Cir.1991).

For the reasons set forth in this opinion, **IT IS ORDERED** that plaintiffs' motion for summary judgment (# 33) is *DENIED.* Floyd Hicks' and the tribal defendants' motions for summary judgment (## 34, 35) are *GRANTED.*