# NEVADA ET AL. *v.* HICKS ET AL.

No. 99–1994.   Argued March 21, 2001—Decided June 25, 2001

SCALIA, J., delivered the opinion of the Court, in which REHNQUIST, C. J., and KENNEDY, SOUTER, THOMAS, and GINSBURG, JJ., joined. SOUTER, J., filed a concurring opinion, in which KENNEDY and THOMAS, JJ., joined, *post*, p. 375. GINSBURG, J., filed a concurring opinion, *post*, p. 386. O'CONNOR, J., filed an opinion concurring in part and concurring in the judgment, in which STEVENS and BREYER, JJ., joined, *post*, p. 387. STEVENS, J., filed an opinion concurring in the judgment, in which BREYER, J., joined, *post*, p. 401.

*C. Wayne Howle*, Senior Deputy Attorney General of Nevada, argued the cause for petitioners. With him on the briefs were *Frankie Sue Del Papa*, Attorney General, *Paul G. Taggart*, Deputy Attorney General, and *Jeffrey S. Sutton*.

*S. James Anaya* argued the cause for respondents and filed a brief for respondent Hicks. *Kim Jerome Gottschalk*

and *Melody McCoy* filed a brief for respondents Tribal Court in and for the Fallon Paiute-Shoshone Tribes et al.

*Barbara McDowell* argued the cause for the United States as *amicus curiae* urging affirmance. With her on the brief were former *Solicitor General Waxman, Assistant Attorney General Schiffer, Deputy Solicitor General Kneedler, David C. Shilton,* and. *William B. Lazarus.**

JUSTICE SCALIA delivered the opinion of the Court.

This case presents the question whether a tribal court may assert jurisdiction over civil claims against state officials who entered tribal land to execute a search warrant against a tribe member suspected of having violated state law outside the reservation.

I

Respondent Hicks[1] is one of about 900 members of the Fallon Paiute-Shoshone Tribes of western Nevada. He re-

---

*A brief of *amici curiae* urging reversal was filed for the State of Montana et al. by *Joseph P. Mazurek,* Attorney General of Montana, *Clay R. Smith,* Solicitor, and *Harley R. Harris,* Assistant Attorney General, joined by the Attorneys General for their respective States as follows: *Bill Pryor* of Alabama, *Janet Napolitano* of Arizona, *Richard Blumenthal* of Connecticut, *Robert A. Butterworth* of Florida, *Carla J. Stovall* of Kansas, *Jennifer M. Granholm* of Michigan, *Mike Moore* of Mississippi, *Heidi Heitkamp* of North Dakota, *W. A. Drew Edmondson* of Oklahoma, *Hardy Myers* of Oregon, *Sheldon Whitehouse* of Rhode Island, *Charles M. Condon* of South Carolina, *Mark Barnett* of South Dakota, *John Cornyn* of Texas, *Jan Graham* of Utah, *James E. Doyle* of Wisconsin, and *Gay Woodhouse* of Wyoming.

Briefs of *amici curiae* urging affirmance were filed for the Coalition for Local Sovereignty by *Kenneth B. Clark;* for the Confederated Tribes of the Colville Reservation et al. by *William R. Perry;* for the Pyramid Lake Paiute Tribe of Nevada et al. by *John Fredericks III;* and for the Thlopthlocco Tribal Town et al. by *D. Michael McBride III* and *Steven K. Balman.*

[1] Hereinafter, Hicks will be referred to as "respondent." The Tribal Court and Judge are also respondents, however, and are included when the term "respondents" is used.

sides on the Tribes' reservation of approximately 8,000 acres, established by federal statute in 1908, ch. 53, 35 Stat. 85. In 1990 Hicks came under suspicion of having killed, off the reservation, a California bighorn sheep, a gross misdemeanor under Nevada law, see Nev. Rev. Stat. § 501.376 (1999). A state game warden obtained from state court a search warrant "SUBJECT TO OBTAINING APPROVAL FROM THE FALLON TRIBAL COURT IN AND FOR THE FALLON PAIUTE-SHOSHONE TRIBES." According to the issuing judge, this tribal-court authorization was necessary because "[t]his Court has no jurisdiction on the Fallon Paiute-Shoshone Indian Reservation." App. G to Pet. for Cert. 1. A search warrant was obtained from the tribal court, and the warden, accompanied by a tribal police officer, searched respondent's yard, uncovering only the head of a Rocky Mountain bighorn, a different (and unprotected) species of sheep.

Approximately one year later, a tribal police officer reported to the warden that he had observed two mounted bighorn sheep heads in respondent's home. The warden again obtained a search warrant from state court; though this warrant did not explicitly require permission from the Tribes, see App. F to Pet. for Cert. 2, a tribal-court warrant was nonetheless secured, and respondent's home was again (unsuccessfully) searched by three wardens and additional tribal officers.

Respondent, claiming that his sheep heads had been damaged, and that the second search exceeded the bounds of the warrant, brought suit against the Tribal Judge, the tribal officers, the state wardens in their individual and official capacities, and the State of Nevada in the Tribal Court in and for the Fallon Paiute-Shoshone Tribes. (His claims against all defendants except the state wardens and the State of Nevada were dismissed by directed verdict and are not at issue here.) Respondent's causes of action included trespass to land and chattels, abuse of process, and violation of civil

rights—specifically, denial of equal protection, denial of due process, and unreasonable search and seizure, each remediable under Rev. Stat. § 1979, 42 U. S. C. § 1983. See App. 8–21, 25–29. Respondent later voluntarily dismissed his case against the State and against the state officials in their official capacities, leaving only his suit against those officials in their individual capacities. See *id.*, at 32–35.

The Tribal Court held that it had jurisdiction over the claims, a holding affirmed by the Tribal Appeals Court. The state officials and Nevada then filed an action in Federal District Court seeking a declaratory judgment that the Tribal Court lacked jurisdiction. The District Court granted summary judgment to respondent on the issue of jurisdiction, and also held that the state officials would have to exhaust any claims of qualified immunity in the tribal court. The Ninth Circuit affirmed, concluding that the fact that respondent's home is located on tribe-owned land within the reservation is sufficient to support tribal jurisdiction over civil claims against nonmembers arising from their activities on that land. 196 F. 3d 1020 (1999). We granted certiorari, 531 U. S. 923 (2000).

II

In this case, which involves claims brought under both tribal and federal law, it is necessary to determine, as to the former, whether the Tribal Court in and for the Fallon Paiute-Shoshone Tribes has jurisdiction to adjudicate the alleged tortious conduct of state wardens executing a search warrant for evidence of an off-reservation crime; and, as to the latter, whether the Tribal Court has jurisdiction over claims brought under 42 U. S. C. § 1983. We address the former question first.

A

The principle of Indian law central to this aspect of the case is our holding in *Strate* v. *A–1 Contractors*, 520 U. S. 438, 453 (1997): "As to nonmembers . . . a tribe's adjudicative

jurisdiction does not exceed its legislative jurisdiction . . . ." That formulation leaves open the question whether a tribe's adjudicative jurisdiction over nonmember defendants *equals* its legislative jurisdiction.[2] We will not have to answer that open question if we determine that the Tribes in any event lack legislative jurisdiction in this case. We first inquire, therefore, whether the Fallon Paiute-Shoshone Tribes—either as an exercise of their inherent sovereignty, or under grant of federal authority—can regulate state wardens executing a search warrant for evidence of an off-reservation crime.

Indian tribes' regulatory authority over nonmembers is governed by the principles set forth in *Montana* v. *United States,* 450 U. S. 544 (1981), which we have called the "path-marking case" on the subject, *Strate, supra,* at 445. In deciding whether the Crow Tribe could regulate hunting and fishing by nonmembers on land held in fee simple by nonmembers, *Montana* observed that, under our decision in *Oliphant* v. *Suquamish Tribe,* 435 U. S. 191 (1978), tribes lack criminal jurisdiction over nonmembers. Although, it continued, *"Oliphant* only determined inherent tribal authority in criminal matters, the principles on which it relied support the general proposition that the inherent sovereign

---

[2] In *National Farmers Union Ins. Cos.* v. *Crow Tribe,* 471 U. S. 845, 855–856 (1985), we avoided the question whether tribes may generally adjudicate against nonmembers claims arising from on-reservation transactions, and we have never held that a tribal court had jurisdiction over a nonmember defendant. Typically, our cases have involved claims brought against tribal defendants. See, *e. g., Williams* v. *Lee,* 358 U. S. 217 (1959). In *Strate* v. *A–1 Contractors,* 520 U. S. 438, 453 (1997), however, we assumed that "where tribes possess authority to regulate the activities of nonmembers, civil jurisdiction over disputes arising out of such activities presumably lies in the tribal courts," without distinguishing between nonmember plaintiffs and nonmember defendants. See also *Iowa Mut. Ins. Co.* v. *LaPlante,* 480 U. S. 9, 18 (1987). Our holding in this case is limited to the question of tribal-court jurisdiction over state officers enforcing state law. We leave open the question of tribal-court jurisdiction over nonmember defendants in general.

powers of an Indian tribe do not extend to the activities of nonmembers of the tribe." 450 U. S., at 565 (footnote omitted). Where nonmembers are concerned, the "exercise of tribal power *beyond what is necessary to protect tribal self-government or to control internal relations* is inconsistent with the dependent status of the tribes, and so cannot survive without express congressional delegation." *Id.,* at 564 (emphasis added).[3]

Both *Montana* and *Strate* rejected tribal authority to regulate nonmembers' activities on land over which the tribe could not "assert a landowner's right to occupy and exclude," *Strate, supra,* at 456; *Montana, supra,* at 557, 564. Respondents and the United States argue that since Hicks's home and yard *are* on tribe-owned land within the reservation, the Tribe may make its exercise of regulatory authority over nonmembers a condition of nonmembers' entry. Not necessarily. While it is certainly true that the non-Indian ownership status of the land was central to the analysis in both *Montana* and *Strate,* the reason that was so was *not* that Indian ownership suspends the "general proposition" derived from *Oliphant* that "the inherent sovereign powers of an Indian tribe do not extend to the activities of nonmembers of the tribe" except to the extent "necessary to protect tribal self-government or to control internal relations." 450 U. S., at 564–565. *Oliphant* itself drew no distinctions based on the status of land. And *Montana,* after announcing the general rule of no jurisdiction over non-

---

[3] *Montana* recognized an exception to this rule for tribal regulation of "the activities of nonmembers who enter consensual relationships with the tribe or its members, through commercial dealing, contracts, leases, or other arrangements." 450 U. S., at 565. Though the wardens in this case "consensually" obtained a warrant from the Tribal Court before searching respondent's home and yard, we do not think this qualifies as an "other arrangement" within the meaning of this passage. Read in context, an "other arrangement" is clearly another *private consensual* relationship, from which the official actions at issue in this case are far removed.

members, cautioned that "[t]o be sure, Indian tribes retain inherent sovereign power to exercise some forms of civil jurisdiction over non-Indians on their reservations, even on non-Indian fee lands," 450 U. S., at 565—clearly implying that the general rule of *Montana* applies to both Indian and non-Indian land. The ownership status of land, in other words, is only one factor to consider in determining whether regulation of the activities of nonmembers is "necessary to protect tribal self-government or to control internal relations." It may sometimes be a dispositive factor. Hitherto, the absence of tribal ownership has been virtually conclusive of the absence of tribal civil jurisdiction; with one minor exception, we have never upheld under *Montana* the extension of tribal civil authority over nonmembers on non-Indian land. Compare, *e. g., Merrion* v. *Jicarilla Apache Tribe*, 455 U. S. 130, 137, 142 (1982) (tribe has taxing authority over tribal lands leased by nonmembers), with *Atkinson Trading Co.* v. *Shirley*, 532 U. S. 645, 659 (2001) (tribe has no taxing authority over nonmembers' activities on land held by nonmembers in fee); but see *Brendale* v. *Confederated Tribes and Bands of Yakima Nation*, 492 U. S. 408, 443–444, 458–459 (1989) (opinions of STEVENS, J., and Blackmun, J.) (tribe can impose zoning regulation on that 3.1% of land within reservation area closed to public entry that was not owned by the tribe). But the existence of tribal ownership is not alone enough to support regulatory jurisdiction over nonmembers.

We proceed to consider, successively, the following questions: whether regulatory jurisdiction over state officers in the present context is "necessary to protect tribal self-government or to control internal relations," and, if not, whether such regulatory jurisdiction has been congressionally conferred.

### B

In *Strate*, we explained that what is necessary to protect tribal self-government and control internal relations can be understood by looking at the examples of tribal power to

which *Montana* referred: tribes have authority "[to punish tribal offenders,] to determine tribal membership, to regulate domestic relations among members, and to prescribe rules of inheritance for members," 520 U. S., at 459 (brackets in original), quoting *Montana, supra,* at 564. These examples show, we said, that Indians have "'the right . . . to make their own laws and be ruled by them,'" 520 U. S., at 459, quoting *Williams* v. *Lee,* 358 U. S. 217, 220 (1959). See also *Fisher* v. *District Court of Sixteenth Judicial Dist. of Mont.,* 424 U. S. 382, 386 (1976) *(per curiam)* ("In litigation between Indians and non-Indians arising out of conduct on an Indian reservation, resolution of conflicts between the jurisdiction of state and tribal courts has depended, absent a governing Act of Congress, on whether the state action infringed on the right of reservation Indians to make their own laws and be ruled by them" (internal quotation marks and citation omitted)). Tribal assertion of regulatory authority over nonmembers must be connected to that right of the Indians to make their own laws and be governed by them. See *Merrion, supra,* at 137, 142 ("The power to tax is an essential attribute of Indian sovereignty because it is a necessary instrument of self-government," at least as to "tribal lands" on which the tribe "has . . . authority over a nonmember").

Our cases make clear that the Indians' right to make their own laws and be governed by them does not exclude all state regulatory authority on the reservation. State sovereignty does not end at a reservation's border. Though tribes are often referred to as "sovereign" entities, it was "long ago" that "the Court departed from Chief Justice Marshall's view that 'the laws of [a State] can have no force' within reservation boundaries. *Worcester* v. *Georgia,* 6 Pet. 515, 561 (1832)," *White Mountain Apache Tribe* v. *Bracker,* 448 U. S. 136, 141 (1980).[4] "Ordinarily," it is now clear, "an Indian

---

[4] Our holding in *Worcester* must be considered in light of the fact that "[t]he 1828 treaty with the Cherokee Nation . . . guaranteed the Indians their lands would never be subjected to the jurisdiction of any State or

reservation is considered part of the territory of the State." U. S. Dept. of Interior, Federal Indian Law 510, and n. 1 (1958), citing *Utah & Northern R. Co.* v. *Fisher*, 116 U. S. 28 (1885); see also *Organized Village of Kake* v. *Egan*, 369 U. S. 60, 72 (1962).

That is not to say that States may exert the same degree of regulatory authority within a reservation as they do without. To the contrary, the principle that Indians have the right to make their own laws and be governed by them requires "an accommodation between the interests of the Tribes and the Federal Government, on the one hand, and those of the State, on the other." *Washington* v. *Confederated Tribes of Colville Reservation*, 447 U. S. 134, 156 (1980); see also *id.*, at 181 (opinion of REHNQUIST, J.). "When on-reservation conduct involving only Indians is at issue, state law is generally inapplicable, for the State's regulatory interest is likely to be minimal and the federal interest in encouraging tribal self-government is at its strongest." *Bracker, supra*, at 144. When, however, state interests outside the reservation are implicated, States may regulate the activities even of tribe members on tribal land, as exemplified by our decision in *Confederated Tribes*. In that case, Indians were selling cigarettes on their reservation to nonmembers from off reservation, without collecting the state cigarette tax. We held that the State could require the Tribes to collect the tax from nonmembers, and could "impose at least 'minimal' burdens on the Indian retailer to aid in enforcing and collecting the tax," 447 U. S., at 151. It is also well established in our precedent that States have criminal jurisdiction over reservation Indians for crimes committed (as was the alleged poaching in this case) off the reservation. See *Mescalero Apache Tribe* v. *Jones*, 411 U. S. 145, 148–149 (1973).

Territory." *Organized Village of Kake* v. *Egan*, 369 U. S. 60, 71 (1962); cf. *Williams* v. *Lee*, 358 U. S., at 221–222 (comparing Navajo treaty to the Cherokee treaty in *Worcester*).

While it is not entirely clear from our precedent whether the last mentioned authority entails the corollary right to enter a reservation (including Indian-fee lands) for enforcement purposes, several of our opinions point in that direction. In *Confederated Tribes,* we explicitly reserved the question whether state officials could seize cigarettes held for sale to nonmembers in order to recover the taxes due. See 447 U. S., at 162. In *Utah & Northern R. Co.,* however, we observed that "[i]t has . . . been held that process of [state] courts may run into an Indian reservation of this kind, where the subject-matter or controversy is otherwise within their cognizance," 116 U. S., at 31.[5] Shortly thereafter, we considered, in *United States* v. *Kagama,* 118 U. S. 375 (1886), whether Congress could enact a law giving federal courts jurisdiction over various common-law, violent crimes committed by Indians on a reservation within a State. We expressed skepticism that the Indian Commerce Clause could justify this assertion of authority in derogation of state jurisdiction, but ultimately accepted the argument that the law

> "does not interfere with the process of the State courts within the reservation, nor with the operation of State laws upon white people found there. Its effect is confined to the acts of an Indian of some tribe, of a criminal character, committed within the limits of the reservation.
>
> "It seems to us that this is within the competency of Congress." *Id.,* at 383.

The Court's references to "process" in *Utah & Northern R. Co.* and *Kagama,* and the Court's concern in *Kagama* over possible federal encroachment on state prerogatives, sug-

---

[5] Though *Utah & Northern R. Co.* did not state what it meant by a "reservation of this kind," the context makes clear that it meant a reservation not excluded from the territory of a State by treaty. See, *e. g., Harkness* v. *Hyde,* 98 U. S. 476, 478 (1879); *The Kansas Indians,* 5 Wall. 737, 739–741 (1867).

gest state authority to issue search warrants in cases such as the one before us. ("Process" is defined as "any means used by a court to acquire or exercise its jurisdiction over a person or over specific property," Black's Law Dictionary 1084 (5th ed. 1979), and is equated in criminal cases with a warrant, *id.*, at 1085.) It is noteworthy that *Kagama* recognized the right of state *laws* to "operat[e] . . . upon [non-Indians] found" within a reservation, but did not similarly limit to non-Indians or the property of non-Indians the scope of the *process* of state courts. This makes perfect sense, since, as we explained in the context of federal enclaves, the reservation of state authority to serve process is necessary to "prevent [such areas] from becoming an asylum for fugitives from justice." *Fort Leavenworth R. Co.* v. *Lowe,* 114 U. S. 525, 533 (1885).[6]

We conclude today, in accordance with these prior statements, that tribal authority to regulate state officers in executing process related to the violation, off reservation, of state laws is not essential to tribal self-government or internal relations—to "the right to make laws and be ruled by them." The State's interest in execution of process is considerable, and even when it relates to Indian-fee lands it no more impairs the tribe's self-government than federal enforcement of federal law impairs state government. Respondents argue that, even conceding the State's general interest in enforcing its off-reservation poaching law on the reservation, Nevada's interest in *this suit* is minimal, because it is a suit against state officials in their *individual*

---

[6] That this risk is not purely hypothetical is demonstrated by *Arizona ex rel. Merrill* v. *Turtle,* 413 F. 2d 683 (CA9 1969), a case in which the Navajo Tribal Court refused to extradite a member to Oklahoma because tribal law forbade extradition except to three neighboring States. The Ninth Circuit held that Arizona (where the reservation was located) could not enter the reservation to seize the suspect for extradition since (among other reasons) this would interfere with tribal self-government, *id.*, at 685–686.

capacities. We think, however, that the distinction between individual and official capacity suits is irrelevant. To paraphrase our opinion in *Tennessee* v. *Davis*, 100 U. S. 257, 263 (1880), which upheld a federal statute permitting federal officers to remove to federal court state criminal proceedings brought against them for their official actions, a State "can act only through its officers and agents," and if a tribe can "affix penalties to acts done under the immediate direction of the [state] government, and in obedience to its laws," "the operations of the [state] government may at any time be arrested at the will of the [tribe]." Cf. *Anderson* v. *Creighton*, 483 U. S. 635, 638 (1987) ("[P]ermitting damages suits against government officials can entail substantial social costs, including the risk that fear of personal monetary liability and harassing litigation will unduly inhibit officials in the discharge of their duties").

## C

The States' inherent jurisdiction on reservations can of course be stripped by Congress, see *Draper* v. *United States*, 164 U. S. 240, 242–243 (1896). But with regard to the jurisdiction at issue here that has not occurred. The Government's assertion that "[a]s a general matter, although state officials have jurisdiction to investigate and prosecute crimes on a reservation that exclusively involve non-Indians, . . . they do not have jurisdiction with respect to crimes involving Indian perpetrators or Indian victims," Brief for United States as *Amicus Curiae* 12–13, n. 7, is misleading. The statutes upon which it relies, see *id.*, at 18–19, show that the last half of the statement, like the first, is limited to "crimes *on a reservation*." Sections 1152 and 1153 of Title 18, which give United States and tribal criminal law generally exclusive application, apply only to crimes committed *in Indian country;* Public Law 280, codified at 18 U. S. C. § 1162, which permits some state jurisdiction as an exception to this rule, is similarly limited. And 25 U. S. C.

§ 2804, which permits federal-state agreements enabling state law enforcement agents to act on reservations, applies only to deputizing them for the enforcement of federal or tribal criminal law. Nothing in the federal statutory scheme prescribes, or even remotely suggests, that state officers cannot enter a reservation (including Indian-fee land) to investigate or prosecute violations of state law occurring off the reservation. To the contrary, 25 U. S. C. § 2806 affirms that "the provisions of this chapter alter neither . . . the law enforcement, investigative, or judicial authority of any . . . State, or political subdivision or agency thereof . . . ."

## III

We turn next to the contention of respondent and the Government that the tribal court, as a court of general jurisdiction, has authority to entertain federal claims under § 1983.[7] It is certainly true that state courts of "general jurisdiction" can adjudicate cases invoking federal statutes, such as § 1983, absent congressional specification to the contrary. "Under [our] system of dual sovereignty, we have consistently held that state courts have inherent authority, and are thus presumptively competent, to adjudicate claims arising under the laws of the United States," *Tafflin* v. *Levitt*, 493 U. S. 455, 458 (1990). That this would be the case was assumed by the Framers, see The Federalist No. 82, pp. 492–493 (C. Rossiter ed. 1961). Indeed, that state courts could enforce federal law is presumed by Article III of the

---

[7] JUSTICE STEVENS questions why it is necessary to consider tribal-court jurisdiction over § 1983 claims, since we have already determined that "tribal courts lack . . . jurisdiction over 'state wardens executing a search warrant for evidence of an off-reservation crime,'" *post*, at 402, n. 1 (opinion concurring in judgment). It is because the latter determination is based upon *Strate*'s holding that tribal-court jurisdiction does not exceed tribal regulatory jurisdiction; and because that holding contained a significant qualifier: "[a]bsent congressional direction enlarging tribal-court jurisdiction," 520 U. S., at 453. We conclude (as we must) that § 1983 is not such an enlargement.

Constitution, which leaves to Congress the decision whether to create lower federal courts at all. This historical and constitutional assumption of concurrent state-court jurisdiction over federal-law cases is completely missing with respect to tribal courts.

Respondents' contention that tribal courts are courts of "general jurisdiction" is also quite wrong. A state court's jurisdiction is general, in that it "lays hold of all subjects of litigation between parties within its jurisdiction, though the causes of dispute are relative to the laws of the most distant part of the globe." *Id.*, at 493. Tribal courts, it should be clear, cannot be courts of general jurisdiction in this sense, for a tribe's inherent adjudicative jurisdiction over nonmembers is at most only as broad as its legislative jurisdiction. See *supra*, at 357–359.[8] It is true that some statutes proclaim tribal-court jurisdiction over certain questions of federal law. See, *e. g.*, 25 U. S. C. § 1911(a) (authority to adjudicate child custody disputes under the Indian Child Welfare Act of 1978); 12 U. S. C. § 1715z–13(g)(5) (jurisdiction over mortgage foreclosure actions brought by the Secretary of Housing and Urban Development against reserva-

---

[8] JUSTICE STEVENS argues that "[a]bsent federal law to the contrary, the question whether tribal courts are courts of general jurisdiction is fundamentally one of tribal law." *Post*, at 402 (emphasis deleted). The point of our earlier discussion is that *Strate* is "federal law to the contrary." JUSTICE STEVENS thinks *Strate* cannot fill that role, because it "merely concerned the circumstances under which tribal courts can exert jurisdiction over claims against nonmembers," *post*, at 403, n. 3. But *Strate*'s limitation on jurisdiction over nonmembers pertains to subject-matter, rather than merely personal, jurisdiction, since it turns upon whether the actions at issue in the litigation are regulable by the tribe. One can of course say that even courts of limited subject-matter jurisdiction have general jurisdiction over those subjects that they *can* adjudicate (in the present case, jurisdiction over claims pertaining to activities by nonmembers that can be regulated)—but that makes the concept of general jurisdiction meaningless, and is assuredly not the criterion that would determine whether these courts received authority to adjudicate § 1983 actions.

tion homeowners). But no provision in federal law provides for tribal-court jurisdiction over § 1983 actions.

Furthermore, tribal-court jurisdiction would create serious anomalies, as the Government recognizes, because the general federal-question removal statute refers only to removal from *state* court, see 28 U. S. C. § 1441. Were § 1983 claims cognizable in tribal court, defendants would inexplicably lack the right available to state-court § 1983 defendants to seek a federal forum. The Government thinks the omission of reference to tribal courts in § 1441 unproblematic. Since, it argues, "[i]t is doubtful . . . that Congress intended to deny tribal court defendants the right given state court defendants to elect a federal forum for the adjudication of causes of action under federal law," we should feel free to create that right by permitting the tribal-court defendant to obtain a federal-court injunction against the action, effectively forcing it to be refiled in federal court. Brief for United States as *Amicus Curiae* 25–26. The sole support for devising this extraordinary remedy is *El Paso Natural Gas Co.* v. *Neztsosie,* 526 U. S. 473 (1999), where we approved a similar procedure with regard to claims under the Price-Anderson Act brought in tribal court. In *Neztsosie,* however, the claims were not initially federal claims, but Navajo tort claims that the Price-Anderson Act provided "shall be deemed to be . . . action[s] arising under" 42 U. S. C. § 2210; there was little doubt that the tribal court had jurisdiction over such tort claims, see 526 U. S., at 482, n. 4. And for the propriety of the injunction in *Neztsosie,* we relied not on § 1441, but on the removal provision of the Price-Anderson Act, 42 U. S. C. § 2210(n)(2). Although, like § 1441, that provision referred only to removal from state courts, in light of the Act's detailed and distinctive provisions for the handling of "nuclear incident" cases in federal court, see 526 U. S., at 486, we thought it clear Congress envisioned the defendant's ability to get into federal court in all in-

stances. Not only are there missing here any distinctive federal-court procedures, but in order even to *confront* the question whether an unspecified removal power exists, we must first attribute to tribal courts jurisdiction that is not apparent. Surely the simpler way to avoid the removal problem is to conclude (as other indications suggest anyway) that tribal courts cannot entertain § 1983 suits.

## IV

The last question before us is whether petitioners were required to exhaust their jurisdictional claims in Tribal Court before bringing them in Federal District Court. See *National Farmers Union Ins. Cos.* v. *Crow Tribe*, 471 U. S. 845, 856–857 (1985). In *National Farmers Union* we recognized exceptions to the exhaustion requirement, where "an assertion of tribal jurisdiction is motivated by a desire to harass or is conducted in bad faith, . . . or where the action is patently violative of express jurisdictional prohibitions, or where exhaustion would be futile because of the lack of an adequate opportunity to challenge the court's jurisdiction," *id.*, at 856, n. 21 (internal quotation marks omitted). None of these exceptions seems applicable to this case, but we added a broader exception in *Strate:* "[w]hen . . . it is plain that no federal grant provides for tribal governance of nonmembers' conduct on land covered by *Montana*'s main rule," so the exhaustion requirement "would serve no purpose other than delay." 520 U. S., at 459–460, and n. 14. Though this exception too is technically inapplicable, the reasoning behind it is not. Since it is clear, as we have discussed, that tribal courts lack jurisdiction over state officials for causes of action relating to their performance of official duties, adherence to the tribal exhaustion requirement in such cases "would serve no purpose other than delay," and is therefore unnecessary.

V

Finally, a few words in response to the concurrence of JUSTICE O'CONNOR, which is in large part a dissent from the views expressed in this opinion.[9]

The principal point of the concurrence is that our reasoning "gives only passing consideration to the fact that the state officials' activities in this case occurred on land owned and controlled by the Tribes," *post*, at 392. According to JUSTICE O'CONNOR, "that factor is not prominent in the Court's analysis," *post*, at 395. Even a cursory reading of our opinion demonstrates that this is not so. To the contrary, we acknowledge that tribal ownership is a factor in the *Montana* analysis, and a factor significant enough that it "may sometimes be . . . dispositive," *supra*, at 360. We simply do not find it dispositive in the present case, when weighed against the State's interest in pursuing off-reservation violations of its laws. See *supra*, at 364 (concluding that "[t]he State's interest in execution of process is considerable" enough to outweigh the tribal interest in self-government "even when it relates to Indian-fee lands"). The concurrence is of course free to disagree with this judgment; but to say that failure to give tribal ownership deter-

---

[9] JUSTICE O'CONNOR claims we have gone beyond the scope of the questions presented in this case by determining whether the Tribes could *regulate* the state game warden's actions on tribal land, because this is a case about tribal "civil *adjudicatory* jurisdiction." See *post*, at 397 (opinion concurring in part and concurring in judgment). But the third question presented, see Pet. for Writ of Cert. i, is as follows: "Is the rule of *[Montana]*, creating a presumption against tribal court jurisdiction over non-members, limited to cases in which a cause of action against a nonmember arises on lands within a reservation which are not controlled by the tribe?" *Montana* dealt only with regulatory authority, and is tied to adjudicatory authority by *Strate*, which held that the latter at best *tracks* the former. As is made clear in the merits briefing, petitioners' argument is that the Tribes lacked adjudicatory authority *because* they lacked regulatory authority over the game wardens. See Brief for Petitioners 36–44.

minative effect "fails to consider adequately the Tribe's inherent sovereign interests in activities on their land," *post*, at 401 (opinion of O'CONNOR, J.), is an exaggeration.

The concurrence marshals no authority and scant reasoning to support its judgment that tribal authority over state officers pursuing, on tribe-owned land, off-reservation violations of state law may be "necessary to protect tribal self-government or to control internal relations." *Montana*, 450 U. S., at 564–565. *Self*-government and *internal* relations are not directly at issue here, since the issue is whether the Tribes' law will apply, not to their own members, but to a narrow category of outsiders. And the concurrence does not try to explain how allowing state officers to pursue off-reservation violation of state law "threatens or has some direct effect on the political integrity, the economic security, or the health or welfare of the tribe," *id.*, at 566. That the actions of these state officers cannot threaten or affect those interests is guaranteed by the limitations of federal constitutional and statutory law to which the officers are fully subject.

The concurrence exaggerates and distorts the consequences of our conclusion, *supra*, at 359, n. 3, that the term "other arrangements" in a passage from *Montana* referred to other *"private consensual"* arrangements—so that it did not include the state officials' obtaining of tribal warrants in the present case. That conclusion is correct, as a fuller exposition of the passage from *Montana* makes clear:

> "To be sure, Indian tribes retain inherent sovereign power to exercise some forms of civil jurisdiction over non-Indians on their reservations, even on non-Indian fee lands. A tribe may regulate, through taxation, licensing, or other means, the activities of nonmembers who enter consensual relationships with the tribe or its members, through commercial dealing, contracts, leases, or other arrangements." 450 U. S., at 565.

The Court (this is an opinion, bear in mind, not a statute) obviously did not have in mind States or state officers acting in their governmental capacity; it was referring to private individuals who voluntarily submitted themselves to tribal regulatory jurisdiction by the arrangements that they (or their employers) entered into. This is confirmed by the fact that all four of the cases in the immediately following citation involved private commercial actors. See *Confederated Tribes*, 447 U. S., at 152 (nonmember purchasers of cigarettes from tribal outlet); *Williams* v. *Lee*, 358 U. S., at 217 (general store on the Navajo reservation); *Morris* v. *Hitchcock*, 194 U. S. 384 (1904) (ranchers grazing livestock and horses on Indian lands "under contracts with individual members of said tribes"); *Buster* v. *Wright*, 135 F. 947, 950 (CA8 1905) (challenge to the "permit tax" charged by a tribe to nonmembers for "the privilege . . . of trading within the borders").

The concurrence concludes from this brief footnote discussion that we would invalidate express or implied cessions of regulatory authority over nonmembers contained in state-tribal cooperative agreements, including those pertaining to mutual law enforcement assistance, tax administration assistance, and child support and paternity matters. See *post*, at 393–394. This is a great overreaching. The footnote does not assert that "a consensual relationship [between a tribe and a State] could never exist," *post*, at 394 (opinion of O'CONNOR, J.). It merely asserts that "other arrangements" in the passage from *Montana* does not include state officers' obtaining of an (unnecessary) tribal warrant. Whether contractual relations between State and tribe can expressly or impliedly confer tribal regulatory jurisdiction over nonmembers—and whether such conferral can be effective to confer adjudicative jurisdiction as well—are questions that may arise in another case, but are not at issue here.

Another exaggeration is the concurrence's contention that we "give nonmembers freedom to act with impunity on tribal

land based solely on their status as state law enforcement officials," *post*, at 401 (opinion of O'CONNOR, J.). We do not say state officers cannot be regulated; we say they cannot be regulated in the performance of their law enforcement duties. Action unrelated to that is potentially subject to tribal control depending on the outcome of *Montana* analysis. Moreover, even where the issue is whether the officer has acted unlawfully in the performance of his duties, the tribe and tribe members are of course able to invoke the authority of the Federal Government and federal courts (or the state government and state courts) to vindicate constitutional or other federal- and state-law rights.

We must comment upon the final paragraphs of Part II of the concurrence's opinion—which bring on stage, in classic fashion, a *deus ex machina* to extract, from the seemingly insoluble difficulties that the prior writing has created, a happy ending. The concurrence manages to have its cake and eat it too—to hand over state law enforcement officers to the jurisdiction of tribal courts and yet still assure that the officers' traditional immunity (and hence the State's law enforcement interest) will be protected—by simply announcing "that in order to protect government officials, immunity claims should be considered in reviewing tribal court jurisdiction." *Post*, at 401 (opinion of O'CONNOR, J.). What wonderful magic. Without so much as a citation (none is available) the concurrence declares the qualified immunity inquiry to be part of the jurisdictional inquiry, thus bringing it within the ken of the federal court at the outset of the case. There are two problems with this declaration. The first is that it is not true. There is no authority whatever for the proposition that absolute- and qualified-immunity defenses pertain to the court's jurisdiction—much less to the tribe's *regulatory* jurisdiction, which is what is at issue here. (If they did pertain to the court's jurisdiction, they would presumably be nonwaivable. Cf. *Idaho* v. *Coeur d'Alene Tribe of Idaho*, 521 U. S. 261, 267 (1997).) And the second

problem is that without *first* determining whether the tribe has regulatory jurisdiction, it is impossible to know which "immunity defenses" the federal court is supposed to consider. The tribe's law on this subject need not be the same as the State's; indeed, the tribe may decide (as did the common law until relatively recently) that there is no immunity defense whatever without a warrant. See *California* v. *Acevedo*, 500 U. S. 565, 581 (1991) (SCALIA, J., concurring in judgment). One wonders whether, deprived of its *deus ex machina*, the concurrence would not alter the conclusion it reached in Part I of its opinion, and agree with us that a proper balancing of state and tribal interests would give the Tribes no jurisdiction over state officers pursuing off-reservation violations of state law.

Finally, it is worth observing that the concurrence's resolution would, for the first time, hold a non-Indian subject to the jurisdiction of a tribal court. The question (which we have avoided) whether tribal regulatory and adjudicatory jurisdiction are coextensive is simply answered by the concurrence in the affirmative. As JUSTICE SOUTER's separate opinion demonstrates, it surely deserves more considered analysis.

\* \* \*

Because the Fallon Paiute-Shoshone Tribes lacked legislative authority to restrict, condition, or otherwise regulate the ability of state officials to investigate off-reservation violations of state law, they also lacked adjudicative authority to hear respondent's claim that those officials violated tribal law in the performance of their duties. Nor can the Tribes identify any authority to adjudicate respondent's §1983 claim. And since the lack of authority is clear, there is no need to exhaust the jurisdictional dispute in tribal court. State officials operating on a reservation to investigate off-reservation violations of state law are properly held accountable for tortious conduct and civil rights violations in either state or federal court, but not in tribal court.

The judgment of the Court of Appeals is reversed, and the case remanded for further proceedings consistent with our opinion.

*It is so ordered.*

JUSTICE SOUTER, with whom JUSTICE KENNEDY and JUSTICE THOMAS join, concurring.

I agree that the Fallon Paiute-Shoshone Tribal Court had no jurisdiction to entertain Hicks's claims against the petitioning state officers here, and I join the Court's opinion. While I agree with the Court's analysis as well as its conclusion, I would reach that point by a different route. Like the Court, I take *Montana* v. *United States*, 450 U. S. 544 (1981), to be the source of the first principle on tribal-court civil jurisdiction, see *Atkinson Trading Co.* v. *Shirley*, 532 U. S. 645, 659 (2001) (SOUTER, J., concurring). But while the Court gives emphasis to measuring tribal authority here in light of the State's interest in executing its own legal process to enforce state law governing off-reservation conduct, *ante*, at 360–365, I would go right to *Montana's* rule that a tribe's civil jurisdiction generally stops short of nonmember defendants, 450 U. S., at 565, subject only to two exceptions, one turning on "consensual relationships," the other on respect for "the political integrity, the economic security, or the health or welfare of the tribe," *id.*, at 566.[1]

*Montana* applied this presumption against tribal jurisdiction to nonmember conduct on fee land within a reservation; I would also apply it where, as here, a nonmember acts on tribal or trust land, and I would thus make it explicit that land status within a reservation is not a primary juris-

---

[1] The virtue of the Court's approach is in laying down a rule that would be unquestionably applicable even if in a future case the state officials issuing and executing state process happened to be tribal members (which they apparently are not here).

dictional fact, but is relevant only insofar as it bears on the application of one of *Montana's* exceptions to a particular case. Insofar as I rest my conclusion on the general jurisdictional presumption, it follows for me that, although the holding in this case is "limited to the question of tribal-court jurisdiction over state officers enforcing state law," *ante*, at 358, n. 2, one rule independently supporting that holding (that as a general matter "the inherent sovereign powers of an Indian tribe do not extend to the activities of nonmembers of the tribe," *ante*, at 359) is not so confined.

I

Petitioners are certainly correct that "[t]ribal adjudicatory jurisdiction over nonmembers is . . . ill-defined," Reply Brief for Petitioners 16, since this Court's own pronouncements on the issue have pointed in seemingly opposite directions. Compare, *e. g., Santa Clara Pueblo* v. *Martinez,* 436 U. S. 49, 65 (1978) ("Tribal courts have repeatedly been recognized as appropriate forums for the exclusive adjudication of disputes affecting important personal and property interests of both Indians and non-Indians"), and *United States* v. *Mazurie,* 419 U. S. 544, 557 (1975) ("Indian tribes are unique aggregations possessing attributes of sovereignty over both their members and their territory"), with, *e. g., Oliphant* v. *Suquamish Tribe,* 435 U. S. 191, 209 (1978) (" '[T]he limitation upon [tribes'] sovereignty amounts *to the right of governing every person within their limits except themselves*' " (quoting *Fletcher* v. *Peck,* 6 Cranch 87, 147 (1810))). *Oliphant,* however, clarified tribal courts' criminal jurisdiction (in holding that they had none as to non-Indians), and that decision is now seen as a significant step on the way to *Montana,* "the pathmarking case concerning tribal civil authority over nonmembers," *Strate* v. *A–1 Contractors,* 520 U. S. 438, 445 (1997). The path marked best is the rule

that, at least as a presumptive matter, tribal courts lack civil jurisdiction over nonmembers.[2]

To be sure, *Montana* does not of its own force resolve the jurisdictional issue in this case. There, while recognizing that the parties had "raised broad questions about the power of the Tribe to regulate [the conduct of] non-Indians on the reservation," we noted that the issue before us was a "narrow one." 450 U. S., at 557. Specifically, we said, the question presented concerned only the power of an Indian tribe to regulate the conduct of nonmembers "on reservation land owned in fee by nonmembers of the Tribe." *Ibid.* Here, it is undisputed, the acts complained of occurred on reservation land "controlled by a tribe." Pet. for Cert. 24. But although the distinction between tribal and fee land (and, accordingly, between *Montana* and this case) surely exists, it does not in my mind call for a different result. I see the legal principles that animated our presumptive preclusion of tribal jurisdiction in *Montana* as counseling a similar rule as to regulatory, and hence adjudicatory, jurisdiction here.

In *Montana*, the Court began its discussion of tribes' "inherent authority" by noting that "the Indian tribes have lost many of the attributes of sovereignty." 450 U. S., at 563.

[2] The Court in *Montana* v. *United States*, 450 U. S. 544 (1981), referred to "nonmembers" and "non-Indians" interchangeably. In response to our decision in *Duro* v. *Reina*, 495 U. S. 676 (1990), in which we extended the rule of *Oliphant* to deny tribal courts criminal jurisdiction over nonmember Indians (*i. e.*, Indians who are members of other tribes), Congress passed a statute expressly granting tribal courts such jurisdiction, see 105 Stat. 646, 25 U. S. C. § 1301(2). Because, here, we are concerned with the extent of tribes' inherent authority, and not with the jurisdiction statutorily conferred on them by Congress, the relevant distinction, as we implicitly acknowledged in *Strate*, is between members and nonmembers of the tribe. In this case, nonmembership means freedom from tribal-court jurisdiction, since none of the petitioning state officers is identified as an Indian of any tribe.

In "distinguish[ing] between those inherent powers retained by the tribe and those divested," *id.*, at 564, the Court relied on a portion of the opinion in *United States* v. *Wheeler*, 435 U. S. 313, 326 (1978), from which it quoted at length:

> " 'The areas in which . . . implicit divestiture of sovereignty has been held to have occurred are those involving *the relations between an Indian tribe and nonmembers of the tribe.* . . .
>
> " 'These limitations rest on the fact that the dependent status of Indian tribes within our territorial jurisdiction is necessarily inconsistent with their freedom independently *to determine their external relations.* But the powers of self-government, including the power to prescribe and enforce internal criminal laws, are of a different type. They involve *only the relations among members of a tribe.* Thus, they are not such powers as would necessarily be lost by virtue of a tribe's dependent status.' " *Montana, supra,* at 564.

The emphasis in these passages (supplied by the *Montana* Court, not by me) underscores the distinction between tribal members and nonmembers, and seems clearly to indicate, without restriction to the criminal law, that the inherent authority of the tribes has been preserved over the former but not the latter. In fact, after quoting *Wheeler,* the Court invoked *Oliphant, supra,* which (as already noted) had imposed a *per se* bar to tribal-court criminal jurisdiction over non-Indians, even with respect to conduct occurring on tribal land. The *Montana* Court remarked that, "[t]hough *Oliphant* only determined inherent tribal authority in criminal matters, the principles on which it relied" support a more "general proposition" applicable in civil cases as well, namely, that "the inherent sovereign powers of an Indian tribe do not extend to the activities of nonmembers of the tribe." 450 U. S., at 565. Accordingly, the Court in *Montana* repeatedly pressed the member-nonmember distinction, reiter-

ating at one point, for example, that while "the Indian tribes retain their inherent power to determine tribal membership, to regulate domestic relations among members, and to prescribe rules of inheritance for members," the "exercise of tribal power beyond what is necessary to protect tribal self-government or to control internal relations is inconsistent with the dependent status of the tribes, and so cannot survive without express congressional delegation." *Id.*, at 564; cf. *Oliphant* v. *Schlie,* 544 F. 2d 1007, 1015 (CA9 1976) (Kennedy, J., dissenting) ("The concept of sovereignty applicable to Indian tribes need not include the power to prosecute nonmembers. This power, unlike the ability to maintain law and order on the reservation and to exclude nondesireable nonmembers, is not essential to the tribe's identity or its self-governing status"), rev'd *sub nom. Oliphant* v. *Suquamish Tribe,* 435 U. S. 191 (1978).

To *Montana*'s "general proposition" confining the subjects of tribal jurisdiction to tribal members, the Court appended two exceptions that could support tribal jurisdiction in some civil matters. First, a tribe may "regulate . . . the activities of nonmembers who enter consensual relationships with the tribe or its members, through commercial dealing, contracts, leases, or other arrangements." And second, a tribe may regulate nonmember conduct that "threatens or has some direct effect on the political integrity, the economic security, or the health or welfare of the tribe." 450 U. S., at 565–566.[3] But unless one of these exceptions applies, the "general

---

[3] Thus, it is true that tribal courts' "civil subject-matter jurisdiction over non-Indians . . . is not automatically foreclosed, as an extension of *Oliphant* would require." *National Farmers Union Ins. Cos.* v. *Crow Tribe,* 471 U. S. 845, 855 (1985). "*Montana* did not extend the full *Oliphant* rationale to the civil jurisdictional question—which would have completely prohibited civil jurisdiction over nonmembers." *A–1 Contractors* v. *Strate,* 76 F. 3d 930, 937 (CA8 1996). Instead, "the *[Montana]* Court found that the tribe retained *some* civil jurisdiction over nonmembers, which the Court went on to describe in the *Montana* exceptions." *Ibid.*

proposition" governs and the tribe's civil jurisdiction does "not extend to the activities of nonmembers of the tribe."

In *Strate*, we expressly extended the *Montana* framework, originally applied as a measure of tribes' civil regulatory jurisdiction, to limit tribes' civil adjudicatory jurisdiction. We repeated that "absent express authorization by federal statute or treaty, tribal jurisdiction over the conduct of nonmembers exists only in limited circumstances." 520 U. S., at 445. Quoting *Montana*, we further explained that "[i]n the main" (that is, subject to the two exceptions outlined in the *Montana* opinion), " 'the inherent sovereign powers of an Indian tribe'—those powers a tribe enjoys apart from express provision by treaty or statute—'do not extend to the activities of nonmembers of the tribe.' " 520 U. S., at 445–446. Equally important for purposes here was our treatment of the following passage from *Iowa Mut. Ins. Co.* v. *LaPlante*, 480 U. S. 9 (1987), which seemed to state a more expansive jurisdictional position and which had been cited by the Tribal Court in *Strate* in support of broad tribal-court civil jurisdiction over nonmembers:

> " 'Tribal authority over the activities of non-Indians on reservation lands is an important part of tribal sovereignty. See *Montana* v. *United States*, 450 U. S. 544, 565–566 (1981); *Washington* v. *Confederated Tribes of Colville Indian Reservation*, 447 U. S. 134, 152–153 (1980); *Fisher* v. *District Court [of Sixteenth Judicial Dist. of Mont.]*, 424 U. S. [382,] 387–389 [(1976)]. Civil jurisdiction over such activities presumptively lies in the tribal courts unless affirmatively limited by a specific treaty provision or federal statute . . . .' [480 U. S.], at 18." 520 U. S., at 451.

The *Strate* petitioners fastened upon the statement that "civil jurisdiction over" the activities of nonmembers on reservation lands "presumptively lies in the tribal courts." But we resisted the overbreadth of the *Iowa Mutual* dictum.

We said that the passage "scarcely supports the view that the *Montana* rule does not bear on tribal-court adjudicatory authority in cases involving nonmember defendants," 520 U. S., at 451–452, and stressed the "three informative citations" accompanying the statement, which mark the true contours of inherent tribal authority over nonmembers:

> "The first citation points to the passage in *Montana* in which the Court advanced 'the general proposition that the inherent sovereign powers of an Indian tribe do not extend to the activities of nonmembers of the tribe,' with two prime exceptions. The case cited second is *Washington* v. *Confederated Tribes of Colville Reservation,* a decision the *Montana* Court listed as illustrative of the first *Montana* exception . . . . The third case noted in conjunction with the *Iowa Mutual* statement is *Fisher* v. *District Court of Sixteenth Judicial Dist. of Mont.,* a decision the *Montana* Court cited in support of the second *Montana* exception . . . ." *Id.,* at 452 (citations omitted).

Accordingly, in explaining and distinguishing *Iowa Mutual,* we confirmed in *Strate* what we had indicated in *Montana:* that as a general matter, a tribe's civil jurisdiction does not extend to the "activities of non-Indians on reservation lands," *Iowa Mutual, supra,* at 18, and that the only such activities that trigger civil jurisdiction are those that fit within one of *Montana*'s two exceptions.

After *Strate,* it is undeniable that a tribe's remaining inherent civil jurisdiction to adjudicate civil claims arising out of acts committed on a reservation depends in the first instance on the character of the individual over whom jurisdiction is claimed, not on the title to the soil on which he acted. The principle on which *Montana* and *Strate* were decided (like *Oliphant* before them) looks first to human relationships, not land records, and it should make no difference *per se* whether acts committed on a reservation

occurred on tribal land or on land owned by a nonmember individual in fee. It is the membership status of the unconsenting party, not the status of real property, that counts as the primary jurisdictional fact.[4]

## II

Limiting tribal-court civil jurisdiction this way not only applies the animating principle behind our precedents, but fits with historical assumptions about tribal authority and serves sound policy. As for history, JUSTICE STEVENS has observed that "[i]n sharp contrast to the tribes' broad powers over their own members, tribal powers over nonmembers have always been narrowly confined." *Merrion* v. *Jicarilla Apache Tribe*, 455 U. S. 130, 171 (1982) (dissenting opinion). His point is exemplified by the early treaties with those who became known as the five civilized Tribes, which treaties "specifically granted the right of self-government to the tribes [but] specifically excluded jurisdiction over nonmembers." *Id.*, at 171, n. 21 (citing Treaty with the Cherokees, Art. 5, 7 Stat. 481 (1835), Treaty with the Choctaws and Chickasaws, Art. 7, 11 Stat. 612 (1855), and Treaty with the Creeks and Seminoles, Art. 15, 11 Stat. 703 (1856)). In a similar vein, referring to 19th-century federal statutes setting the jurisdiction of the courts of those five Tribes, this Court said in *In re Mayfield*, 141 U. S. 107, 116 (1891), that the "general object" of such measures was "to vest in the courts of the [Indian] nation jurisdiction of all controversies between Indians, or where a member of the nation is the only party to the proceeding, and to reserve to the courts

---

[4] Thus, it is not that land status is irrelevant to a proper *Montana* calculus, only that it is not determinative in the first instance. Land status, for instance, might well have an impact under one (or perhaps both) of the *Montana* exceptions. See *Atkinson Trading Co.* v. *Shirley*, 532 U. S. 645, 659–660 (2001) (SOUTER, J., concurring); cf. *White Mountain Apache Tribe* v. *Bracker*, 448 U. S. 136, 151 (1980) ("[T]here is a significant geographic component to tribal sovereignty").

of the United States jurisdiction of all actions to which its own citizens are parties on either side." And, in fact, to this very day, general federal law prohibits Courts of Indian Offenses (tribunals established by regulation for tribes that have not organized their own tribal court systems) from exercising jurisdiction over unconsenting nonmembers. Such courts have "[c]ivil jurisdiction" only of those actions arising within their territory "in which the defendant is an Indian, and of all other suits between Indians and non-Indians which are brought before the court by stipulation of the parties." 25 CFR § 11.103(a) (2000).

A rule generally prohibiting tribal courts from exercising civil jurisdiction over nonmembers, without looking first to the status of the land on which individual claims arise, also makes sense from a practical standpoint, for tying tribes' authority to land status in the first instance would produce an unstable jurisdictional crazy quilt. Because land on Indian reservations constantly changes hands (from tribes to nonmembers, from nonmembers to tribal members, and so on), a jurisdictional rule under which land status was dispositive would prove extraordinarily difficult to administer and would provide little notice to nonmembers, whose susceptibility to tribal-court jurisdiction would turn on the most recent property conveyances. Cf. *Hodel* v. *Irving*, 481 U. S. 704, 718 (1987) (noting the difficulties that attend the "extreme fractionation of Indian lands").

The ability of nonmembers to know where tribal jurisdiction begins and ends, it should be stressed, is a matter of real, practical consequence given "[t]he special nature of [Indian] tribunals," *Duro* v. *Reina*, 495 U. S. 676, 693 (1990), which differ from traditional American courts in a number of significant respects. To start with the most obvious one, it has been understood for more than a century that the Bill of Rights and the Fourteenth Amendment do not of their own force apply to Indian tribes. See *Talton* v. *Mayes*, 163 U. S. 376, 382–385 (1896); F. Cohen, Handbook of Federal In-

dian Law 664–665 (1982 ed.) (hereinafter Cohen) ("Indian tribes are not states of the union within the meaning of the Constitution, and the constitutional limitations on states do not apply to tribes"). Although the Indian Civil Rights Act of 1968 (ICRA) makes a handful of analogous safeguards enforceable in tribal courts, 25 U. S. C. § 1302, "the guarantees are not identical," *Oliphant*, 435 U. S., at 194,[5] and there is a "definite trend by tribal courts" toward the view that they "ha[ve] leeway in interpreting" the ICRA's due process and equal protection clauses and "need not follow the U. S. Supreme Court precedents 'jot-for-jot,'" Newton, Tribal Court Praxis: One Year in the Life of Twenty Indian Tribal Courts, 22 Am. Indian L. Rev. 285, 344, n. 238 (1998). In any event, a presumption against tribal-court civil jurisdiction squares with one of the principal policy considerations underlying *Oliphant*, namely, an overriding concern that citizens who are not tribal members be "protected . . . from unwarranted intrusions on their personal liberty," 435 U. S., at 210.

Tribal courts also differ from other American courts (and often from one another) in their structure, in the substantive law they apply, and in the independence of their judges. Although some modern tribal courts "mirror American courts" and "are guided by written codes, rules, procedures, and guidelines," tribal law is still frequently unwritten, being based instead "on the values, mores, and norms of a tribe and expressed in its customs, traditions, and practices," and is often "handed down orally or by example from one generation to another." Melton, Indigenous Justice Systems and Tribal Society, 79 Judicature 126, 130–131 (1995). The resulting law applicable in tribal courts is a complex "mix of tribal codes and federal, state, and traditional law," National American Indian Court Judges Assn., Indian

---

[5] See also Cohen 667 ("Many significant constitutional limitations on federal and state governments are not included in the [ICRA]").

Courts and the Future 43 (1978), which would be unusually difficult for an outsider to sort out.

Hence the practical importance of being able to anticipate tribal jurisdiction by reference to a fact more readily knowable than the title status of a particular plot of land. One further consideration confirms the point. It is generally accepted that there is no effective review mechanism in place to police tribal courts' decisions on matters of nontribal law, since tribal-court judgments based on state or federal law can be neither removed nor appealed to state or federal courts. Cf., *e. g.*, 28 U. S. C. § 1441(a) (removal of "any civil action brought in a State court of which the district courts of the United States have original jurisdiction"); § 1257(a) (Supreme Court review of "judgments or decrees rendered by the highest court of a State" where federal law implicated). The result, of course, is a risk of substantial disuniformity in the interpretation of state and federal law, a risk underscored by the fact that "[t]ribal courts are often 'subordinate to the political branches of tribal governments,'" *Duro, supra,* at 693 (quoting Cohen 334–335).

## III

There is one loose end. The panel majority in the Ninth Circuit held that "the *Montana* presumption against tribal court jurisdiction does not apply in this case." 196 F. 3d 1020, 1028 (1999). Since we have held otherwise, should we now remand for application of the correct law? There is room for reasonable disagreement on this point, see *post,* at 396 (O'CONNOR, J., concurring in part and concurring in judgment), but on balance I think a remand is unnecessary. The Court's analysis of opposing state and tribal interests answers the opinion of the Ninth Circuit majority; in substance, the issues subject to the Court of Appeals's principal concern have been considered here. My own focus on the *Montana* presumption was, of course, addressed by the panel (albeit unsympathetically), and the only question that

might now be considered by the Circuit on my separate approach to the case is the applicability of the second *Montana* exception. But as Judge Rymer indicated in her dissent, the uncontested fact that the Tribal Court itself authorized service of the state warrant here bars any serious contention that the execution of that warrant adversely affected the Tribes' political integrity. See 196 F. 3d, at 1033–1034. Thus, even if my alternative rationale exclusively governed the outcome, remand would be pure formality.

JUSTICE GINSBURG, concurring.

I join the Court's opinion. As the Court plainly states, and as JUSTICE SOUTER recognizes, the "holding in this case is limited to the question of tribal-court jurisdiction over state officers enforcing state law." *Ante*, at 358, n. 2 (opinion of the Court); *ante*, at 376 (SOUTER, J., concurring). The Court's decision explicitly "leave[s] open the question of tribal-court jurisdiction over nonmember defendants in general," *ante*, at 358, n. 2, including state officials engaged on tribal land in a venture or frolic of their own, see *ante*, at 373 (a state officer's conduct on tribal land "unrelated to [performance of his law-enforcement duties] is potentially subject to tribal control").

I write separately only to emphasize that *Strate* v. *A–1 Contractors*, 520 U. S. 438 (1997), similarly deferred larger issues. *Strate* concerned a highway accident on a right-of-way over tribal land. For nonmember governance purposes, the accident site was equivalent to alienated, non-Indian land. *Id.*, at 456. We held that the nonmember charged with negligent driving in *Strate* was not amenable to the Tribe's legislative or adjudicatory authority. But we "express[ed] no view on the governing law or proper forum" for cases arising out of nonmember conduct on tribal land. *Id.*, at 442. The Court's opinion, as I understand it, does not reach out definitively to answer the jurisdictional questions left open in *Strate*.

JUSTICE O'CONNOR, with whom JUSTICE STEVENS and JUSTICE BREYER join, concurring in part and concurring in the judgment.

The Court holds that a tribe has no power to regulate the activities of state officials enforcing state law on land owned and controlled by the tribe. The majority's sweeping opinion, without cause, undermines the authority of tribes to "'make their own laws and be ruled by them.'" *Strate* v. *A–1 Contractors*, 520 U. S. 438, 459 (1997) (quoting *Williams* v. *Lee*, 358 U. S. 217, 220 (1959)). I write separately because Part II of the Court's decision is unmoored from our precedents.

## I

## A

Today, the Court finally resolves that *Montana* v. *United States*, 450 U. S. 544 (1981), governs a tribe's civil jurisdiction over nonmembers regardless of land ownership. *Ante*, at 358–360. This is done with little fanfare, but the holding is significant because we have equivocated on this question in the past.

In *Montana*, we held that the Tribe in that case could not regulate the hunting and fishing activities of nonmembers on nontribal land located within the geographical boundaries of the reservation. 450 U. S., at 557. We explained that the Tribe's jurisdiction was limited to two instances—where a consensual relationship exists between the Tribe and nonmembers, or where jurisdiction was necessary to preserve tribal sovereignty—and we concluded that neither instance applied. *Id.*, at 565–567; *ante*, at 358–360.

Given the facts of *Montana*, it was not clear whether the status of the persons being regulated, or the status of the land where the hunting and fishing occurred, led the Court to develop *Montana*'s jurisdictional rule and its exceptions. In subsequent cases, we indicated that the nonmember status of the person being regulated determined *Montana*'s

application, see, *e. g., South Dakota* v. *Bourland*, 508 U. S. 679, 694–695, and n. 15 (1993), while in other cases we indicated that the fee simple status of the land triggered application of *Montana*, see, *e. g., Strate* v. *A–1 Contractors, supra*, at 454, and n. 8. This is the Court's first opportunity in recent years to consider whether *Montana* applies to nonmember activity on land owned and controlled by the tribe. Cf. *Atkinson Trading Co.* v. *Shirley*, 532 U. S. 645 (2001).

The Court of Appeals concluded that *Montana* did not apply in this case because the events in question occurred on tribal land. 196 F. 3d 1020, 1028 (CA9 1999). Because *Montana* is our best source of "coherence in the various manifestations of the general law of tribal jurisdiction over non-Indians," *Atkinson Trading Co.* v. *Shirley, supra*, at 659 (SOUTER, J., concurring), the majority is quite right that *Montana* should govern our analysis of a tribe's civil jurisdiction over nonmembers both on and off tribal land. I part company with the majority, however, because its reasoning is not faithful to *Montana* or its progeny.

## B

*Montana*'s principles bear repeating. In *Montana*, the Court announced the "general proposition that the inherent sovereign powers of an Indian tribe do not extend to the activities of nonmembers of the tribe." 450 U. S., at 565. The Court further explained, however, that tribes do retain some attributes of sovereignty:

> "To be sure, Indian tribes retain inherent sovereign power to exercise some forms of civil jurisdiction over non-Indians on their reservations, even on non-Indian fee lands. A tribe may regulate, through taxation, licensing, or other means, the activities of nonmembers who enter consensual relationships with the tribe or its members, through commercial dealing, contracts, leases, or other arrangements. A tribe may also retain inherent power to exercise civil authority over the conduct of

non-Indians on fee lands within its reservation when that conduct threatens or has some direct effect on the political integrity, the economic security, or the health or welfare of the tribe." *Id.*, at 565–566 (citations omitted).

We concluded in that case that hunting and fishing by nonmembers on reservation land held in fee by nonmembers of the Tribe did not fit within either of the *"Montana* exceptions" that permit jurisdiction over nonmembers. The hunting and fishing in that case did not involve a consensual relationship and did not threaten the security of the Tribe. *Id.*, at 557. We "readily agree[d]" with the Court of Appeals in that case, however, that the Tribe "may prohibit nonmembers from hunting or fishing on land belonging to the Tribe or held by the United States in trust for the Tribe," and that "if the Tribe permits nonmembers to fish or hunt on such lands, it may condition their entry by charging a fee or establishing . . . limits." *Ibid.* In the cases that followed, we uniformly regarded land ownership as an important factor in determining the scope of a tribe's civil jurisdiction.

We have held that the tribe's power to impose taxes on nonmembers doing business on tribal or trust lands of the reservation is "an essential attribute of Indian sovereignty because it is a necessary instrument of self-government and territorial management." *Merrion* v. *Jicarilla Apache Tribe,* 455 U. S. 130, 137 (1982). We held that the tribe's power to tax derived from two distinct sources: the tribe's power of self-government and the tribe's power to exclude. *Id.*, at 137, 149. Recognizing that tribes are "'unique aggregations possessing attributes of sovereignty,'" however, we further explained that the power to tax was "subject to constraints not imposed on other governmental entities" in that the Federal Government could take away that power. *Id.*, at 140–141.

At issue in *Brendale* v. *Confederated Tribes and Bands of Yakima Nation,* 492 U. S. 408 (1989), was whether Tribes

had the authority to zone particular tracts of land within the boundaries of the reservation owned by nonmembers. Although no opinion garnered a majority, Members of the Court determined the Tribes' zoning authority by considering the Tribes' power to exclude and the Tribes' sovereign interests in preserving the Tribes' political integrity, economic security, and health and welfare. *Id.*, at 423–425, 428–432 (White, J., joined by REHNQUIST, C. J., and SCALIA and KENNEDY, JJ.); *id.*, at 433–435, 443–444 (STEVENS, J., joined by O'CONNOR, J.); *id.*, at 454–455 (Blackmun, J., joined by Brennan and Marshall, JJ.). In the end, the Tribes' power to zone each parcel of land turned on the extent to which the Tribes maintained ownership and control over the areas in which the parcels were located. *Id.*, at 438–444, 444–447 (STEVENS, J., joined by O'CONNOR, J.).

In *South Dakota* v. *Bourland, supra,* we were again confronted with a Tribe's attempt to regulate hunting and fishing by nonmembers on lands located within the boundaries of the Tribe's reservation, but not owned by the tribe. In *Bourland,* the United States had acquired the land at issue from the Tribe under the Flood Control Act and the Cheyenne River Act. *Id.*, at 689–690. We concluded that these congressional enactments deprived the Tribe of "any former right of absolute and exclusive use and occupation of the conveyed lands." *Id.*, at 689. We considered that *Montana's* exceptions might support tribal jurisdiction over nonmembers, but decided to leave that issue for consideration on remand. 508 U. S., at 695–696.

We have also applied *Montana* to decide whether a tribal court had civil jurisdiction to adjudicate a lawsuit arising out of a traffic accident on a state highway that passed through a reservation. *Strate* v. *A–1 Contractors,* 520 U. S. 438 (1997). We explained that "*Montana* delineated—in a main rule and exceptions—the bounds of the power tribes retain to exercise 'forms of civil jurisdiction'" over nonmembers. Because our prior cases did not involve jurisdiction of tribal

*courts,* we clarified that "[a]s to nonmembers . . . a tribe's adjudicative jurisdiction does not exceed its legislative jurisdiction." *Id.,* at 453. Again, we considered the status of the land where the nonmember activities occurred. In accord with *Montana,* we "readily agree[d]" "that tribes retain considerable control over nonmember conduct on tribal land." 520 U. S., at 454. But we determined that the right-of-way acquired for the State's highway rendered that land equivalent to "alienated, non-Indian land." *Ibid.* Applying *Montana,* we concluded that the defendant's allegedly tortious conduct did not constitute a consensual relationship that gave rise to tribal court jurisdiction. 520 U. S., at 456–457. We also found that "[n]either regulatory nor adjudicatory authority over the state highway accident . . . is needed to preserve 'the right of reservation Indians to make their own laws and be ruled by them.'" *Id.,* at 459.

Just last month, we applied *Montana* in a case concerning a Tribe's authority to tax nonmember activity occurring on non-Indian fee land. *Atkinson Trading Co.* v. *Shirley,* 532 U. S. 645 (2001). In that case, the Tribe argued that it had the power to tax under *Merrion, supra.* We disagreed, distinguishing *Merrion* on the ground that the Tribe's inherent power to tax "only extended to 'transactions occurring on *trust lands* and significantly involving a tribe or its members.'" 532 U. S., at 653 (quoting *Merrion, supra,* at 137). We explained that "*Merrion* involved a tax that only applied to activity occurring on the reservation, and its holding is therefore easily reconcilable with the *Montana-Strate* line of authority, which we deem to be controlling." 532 U. S., at 653.

*Montana* and our other cases concerning tribal civil jurisdiction over nonmembers occupy a middle ground between our cases that provide for nearly absolute tribal sovereignty over tribe members, see generally *Williams* v. *Lee,* 358 U. S., at 218–223, and our rule that tribes have no inherent criminal jurisdiction over nonmembers, see *Oliphant* v. *Suqua-*

*mish Tribe*, 435 U. S. 191 (1978). *Montana* recognizes that tribes retain sovereign interests in activities that occur on land owned and controlled by the tribe, and provides principles that guide our determination of whether particular activities by nonmembers implicate these sovereign interests to a degree that tribal civil jurisdiction is appropriate.

## C

In this case, the Court purports to apply *Montana*—in keeping with the above line of cases—to determine whether the Tribes, "as an exercise of their inherent sovereignty, . . . can regulate state wardens executing a search warrant for evidence of an off-reservation crime." *Ante*, at 358. The Court's reasoning suffers from two serious flaws: It gives only passing consideration to the fact that the state officials' activities in this case occurred on land owned and controlled by the Tribes, and it treats as dispositive the fact that the nonmembers in this case are state officials.

Under the first *Montana* exception, a tribe may exercise regulatory jurisdiction where a nonmember enters into a consensual relationship with the tribe. 450 U. S., at 565. The majority in this case dismisses the applicability of this exception in a footnote, concluding that any consensual relationship between tribes and nonmembers "clearly" must be a "private" consensual relationship "from which the official actions at issue in this case are far removed." *Ante*, at 359, n. 3.

The majority provides no support for this assertion. The Court's decision in *Montana* did not and could not have resolved the complete scope of the first exception. We could only apply the first exception to the activities presented in that case, namely, hunting and fishing by nonmembers on land owned in fee simple by nonmembers. 450 U. S., at 557. To be sure, *Montana* is "an opinion . . . not a statute," and therefore it seems inappropriate to speak of what the *Mon-*

*tana* Court intended the first exception to mean in future cases. See *ante,* at 372.

State governments may enter into consensual relationships with tribes, such as contracts for services or shared authority over public resources. Depending upon the nature of the agreement, such relationships could provide official consent to tribal regulatory jurisdiction. Some States have formally sanctioned the creation of state-tribal agreements. See, *e. g.,* Mont. Code Ann. § 18–11–101 *et seq.* (1997) (State-Tribal Cooperative Agreements Act); Neb. Rev. Stat. § 13–1502 *et seq.* (1997) (State-Tribal Cooperative Agreements Act); Okla. Stat., Tit. 74, § 1221 (Supp. 2001) (authorizing Governor to enter into cooperative agreements on behalf of the State to address issues of mutual interest). In addition, there are a host of cooperative agreements between tribes and state authorities to share control over tribal lands, to manage public services, and to provide law enforcement. See, *e. g.,* Cal. Health & Safety Code Ann. § 25198.1 *et seq.* (West 1992 and Supp. 2001) (cooperative agreements for hazardous waste management); Cal. Pub. Res. Code Ann. § 44201 *et seq.* (West 1996) (cooperative agreements for solid waste management); Minn. Stat. § 626.90 *et seq.* (Supp. 2001) (authorizing cooperative agreements between state law enforcement and tribal peace officers); Nev. Rev. Stat. § 277.058 (Supp. 1999) (cooperative agreements concerning sites of archeological or historical significance); N. M. Stat. Ann. § 9–11–12.1 (Supp. 2000) (cooperative agreements for tax administration); Ore. Rev. Stat. § 25.075 (1999) (cooperative agreements concerning child support and paternity matters); Wash. Rev. Code § 26.25.010 *et seq.* (1999) (cooperative agreements for child welfare); § 79.60.010 (cooperative agreements among federal, state, and tribal governments for timber and forest management).

Whether a consensual relationship between the Tribes and the State existed in this case is debatable, compare Brief for Petitioners 36–38 with Brief for Respondents Tribal Court

in and for the Fallon Paiute-Shoshone Tribes et al. 23–25, but our case law provides no basis to conclude that such a consensual relationship could never exist. Without a full understanding of the applicable relationships among tribal, state, and federal entities, there is no need to create a *per se* rule that forecloses future debate as to whether cooperative agreements, or other forms of official consent, could ever be a basis for tribal jurisdiction. Compare *ante*, at 359, n. 3, with *ante*, at 372.

The second *Montana* exception states that a tribe may regulate nonmember conduct where that conduct "threatens or has some direct effect on the political integrity, the economic security, or the health or welfare of the tribe." 450 U. S., at 566. The majority concentrates on this aspect of *Montana*, asking whether "regulatory jurisdiction over state officers in the present context is 'necessary to protect tribal self-government or to control internal relations,'" and concludes that it is not. *Ante*, at 360.

At the outset, the Court recites relatively uncontroversial propositions. A tribe's right to make its own laws and be governed by them "does not exclude all state regulatory authority on the reservation"; a reservation "'is considered part of the territory of the State'"; "States may regulate the activities even of tribe members on tribal land"; and the "'process of [state] courts may run into [a] . . . reservation.'" *Ante*, at 361, 362, 363 (citations omitted).

None of "these prior statements," however, "accord[s]" with the majority's conclusion that "tribal authority to regulate state officers in executing process related to [an off-reservation violation of state law] is not essential to tribal self-government or internal relations." *Ante*, at 364. Our prior decisions are informed by the understanding that tribal, Federal, and State Governments *share* authority over tribal lands. See, *e. g., Cotton Petroleum Corp.* v. *New Mexico,* 490 U. S. 163, 176–187 (1989) (concurrent jurisdiction of state and tribal governments to impose severance taxes

on oil and gas production by nonmembers); *Rice* v. *Rehner,* 463 U. S. 713 (1983) (concurrent jurisdiction of Federal and State Governments to issue liquor licenses for transactions on reservations); *Washington* v. *Confederated Tribes of Colville Reservation,* 447 U. S. 134 (1980) (concurrent jurisdiction of state and tribal governments to tax cigarette purchases by nonmembers). Saying that tribal jurisdiction must "accommodat[e]" various sovereign interests does not mean that tribal interests are to be nullified through a *per se* rule. *Id.,* at 156.

The majority's rule undermining tribal interests is all the more perplexing because the conduct in this case occurred on land owned and controlled by the Tribes. Although the majority gives a passing nod to land status at the outset of its opinion, *ante,* at 360, that factor is not prominent in the Court's analysis. This oversight is significant. *Montana* recognizes that tribes may retain inherent power to exercise civil jurisdiction when the nonmember conduct "threatens or has some direct effect on the political integrity, the economic security, or the health or welfare of the tribe." 450 U. S., at 566. These interests are far more likely to be implicated where, as here, the nonmember activity takes place on land owned and controlled by the tribe. If *Montana* is to bring coherence to our case law, we must apply it with due consideration to land status, which has always figured prominently in our analysis of tribal jurisdiction. See *supra,* at 388–392.

This case involves state officials acting on tribal land. The Tribes' sovereign interests with respect to nonmember activities on its land are not extinguished simply because the nonmembers in this case are state officials enforcing state law. Our cases concerning tribal power often involve the competing interests of state, federal, and tribal governments. See, *e. g., Cotton Petroleum Corp., supra; Confederated Tribes, supra; Rehner, supra.* The actions of state officials on tribal land in some instances may affect tribal sovereign interests to a greater, not lesser, degree than the

actions of private parties. In this case, for example, it is alleged that state officers, who gained access to Hicks' property by virtue of their authority as state actors, exceeded the scope of the search warrants and damaged Hicks' personal property.

Certainly, state officials should be protected from civil liability for actions undertaken within the scope of their duties. See *infra*, at 400–401. The majority, however, does not conclude that the officials in this case were acting within the scope of their duties. Moreover, the majority finds it "irrelevant" that Hicks' lawsuits are against state officials in their personal capacities. *Ante*, at 365. The Court instead announces the rule that state officials "cannot be regulated in the performance of their law enforcement duties," but "[a]ction unrelated to that is potentially subject to tribal control." *Ante*, at 373. Here, Hicks alleges that state officials exceeded the scope of their authority under the search warrants. The Court holds that the state officials may not be held liable in Tribal Court for these actions, but never explains where these, or more serious allegations involving a breach of authority, would fall within its new rule of state official immunity.

The Court's reasoning does not reflect a faithful application of *Montana* and its progeny. Our case law does not support a broad *per se* rule prohibiting tribal jurisdiction over nonmembers on tribal land whenever the nonmembers are state officials. If the Court were to remain true to the principles that have governed in prior cases, the Court would reverse and remand the case to the Court of Appeals for a proper application of *Montana* to determine whether there is tribal jurisdiction. Compare 196 F. 3d, at 1032–1034 (Rymer, J., dissenting) (concluding that there is no jurisdiction under *Montana*), with 944 F. Supp. 1455, 1466 (Nev. 1996) (assuming, *arguendo*, that *Montana* applies and concluding that there is jurisdiction). See also *Bourland*, 508 U. S., at 695–696.

## II

The Court's sweeping analysis gives the impression that this case involves a conflict of great magnitude between the State of Nevada and the Fallon Paiute-Shoshone Tribes. That is not so. At no point did the Tribes attempt to exclude the State from the reservation. At no point did the Tribes attempt to obstruct state officials' efforts to secure or execute the search warrants. Quite the contrary, the record demonstrates that judicial and law enforcement officials from the State and the Tribes acted in full cooperation to investigate an off-reservation crime. *Ante*, at 355–357; 944 F. Supp., at 1458–1459.

In this case, Hicks attempts to hold state officials (*and* tribal officials) liable for allegedly exceeding the scope of the search warrants and damaging his personal property. This case concerns the Tribes' civil *adjudicatory* jurisdiction over state officials. The Court concludes that it cannot address adjudicatory jurisdiction without first addressing the Tribes' regulatory jurisdiction. *Ante*, at 357–358. But there is no need for the Court to decide the precise scope of a tribe's regulatory jurisdiction, or to decide in this case whether a tribe's adjudicatory jurisdiction equals its regulatory jurisdiction. Cf. *ante*, at 358, 373–374.

To resolve this case, it suffices to answer the questions presented, which concern the civil adjudicatory jurisdiction of tribal courts. See Pet. for Cert. i. Petitioners contend that tribal court jurisdiction over state officials should be determined with reference to officials' claims of immunity. I agree and would resolve this case by applying basic principles of official and qualified immunity.

The state officials raised immunity defenses to Hicks' claims in Tribal Court. The Tribal Court acknowledged the officials' claims, but did not consider the immunity defenses in determining its jurisdiction. App. to Pet. for Cert. C1–C8. The Federal District Court ruled that because the Tribal Court had not decided the immunity issues, the fed-

eral court should stay its hand and not decide the immunity issues while reviewing the Tribal Court's jurisdiction. 944 F. Supp., at 1468–1469, and n. 26. The Ninth Circuit affirmed, concluding that the District Court correctly applied the exhaustion requirement to the immunity issues. 196 F. 3d, at 1029–1031. In my view, the Court of Appeals misunderstood our precedents when it refused to consider the state officials' immunity claims as it reviewed the Tribal Court's civil jurisdiction.

In determining the relationship between tribal courts and state and federal courts, we have developed a doctrine of exhaustion based on principles of comity. See, e. g., *Iowa Mut. Ins. Co.* v. *LaPlante*, 480 U. S. 9 (1987); *National Farmers Union Ins. Cos.* v. *Crow Tribe*, 471 U. S. 845 (1985). In *National Farmers Union*, a member of the Tribe sued the local school district, an arm of the State, in a personal injury action. *Id.*, at 847. The defendants sued in federal court challenging the Tribal Court's jurisdiction. The District Court concluded that the Tribal Court lacked jurisdiction and enjoined the Tribal Court proceedings. The Court of Appeals reversed, holding that the District Court lacked jurisdiction to enter the injunction.

We reversed the Court of Appeals' conclusion that the District Court lacked jurisdiction over the federal action. We explained that the "extent to which Indian tribes have retained the power to regulate the affairs of non-Indians" is governed by federal law. *Id.*, at 851–852. Likewise, "[t]he question whether an Indian tribe retains the power to compel a non-Indian property owner to submit to the civil jurisdiction of a tribal court is one that must be answered by reference to federal law," and therefore district courts may determine under 28 U. S. C. § 1331 whether a tribal court has exceeded the lawful limits of its jurisdiction. 471 U. S., at 852.

We refused to foreclose entirely the civil jurisdiction of tribal courts over nonmembers as we had foreclosed inherent

criminal jurisdiction over nonmembers in *Oliphant* v. *Suquamish Tribe*, 435 U. S. 191 (1978). See *National Farmers*, 471 U. S., at 854–855. Instead, we reasoned that "the existence and extent of a tribal court's jurisdiction will require a careful examination of tribal sovereignty, the extent to which that sovereignty has been altered, divested, or diminished, as well as a detailed study of relevant statutes, Executive Branch policy as embodied in treaties and elsewhere, and administrative or judicial decisions." *Id.*, at 855–856 (footnote omitted). We concluded that this "examination should be conducted in the first instance in the Tribal Court itself," and that a federal court should "sta[y] its hand" until after the tribal court has had opportunity to determine its own jurisdiction. *Id.*, at 856–857.

In *Iowa Mutual*, an insurance company sued members of a Tribe in federal court on the basis of diversity jurisdiction; at the same time, a civil lawsuit by the tribal members was pending against the nonmember insurance company in Tribal Court. 480 U. S., at 11–13. The District Court granted the tribal members' motion to dismiss the federal action for lack of jurisdiction on the ground that the Tribal Court should have had the first opportunity to determine its jurisdiction. The Court of Appeals affirmed.

We reversed and remanded. We made clear that the Tribal Court should be given the first opportunity to determine its jurisdiction, but emphasized that "[e]xhaustion is required as a matter of comity, not as a jurisdictional prerequisite." *Id.*, at 16–17, and n. 8. We explained that tribal court remedies must be exhausted, but the tribal court's "determination of tribal jurisdiction is ultimately subject to review," and may be challenged in district court. *Id.*, at 19.

Later, in *Strate*, "we reiterate[d] that *National Farmers* and *Iowa Mutual* enunciate only an exhaustion requirement, a prudential rule, based on comity." 520 U. S., at 453 (internal quotation marks and citation omitted). See also *El Paso Natural Gas Co.* v. *Neztsosie*, 526 U. S. 473, 482–487

(1999). Application of that principle in this case leads me to conclude that the District Court and the Court of Appeals should have considered the state officials' immunity claims as they determined the Tribal Court's jurisdiction.

The doctrines of official immunity, see, *e. g., Westfall* v. *Erwin,* 484 U. S. 292, 296–300 (1988), and qualified immunity, see, *e. g., Harlow* v. *Fitzgerald,* 457 U. S. 800, 813–819 (1982), are designed to protect state and federal officials from civil liability for conduct that was within the scope of their duties or conduct that did not violate clearly established law. These doctrines short-circuit civil litigation for officials who meet these standards so that these officials are not subjected to the costs of trial or the burdens of discovery. 457 U. S., at 817–818. For example, the Federal Employees Liability Reform and Tort Compensation Act of 1988, commonly known as the Westfall Act, allows the United States to substitute itself for a federal employee as defendant upon certifying that the employee was acting within the scope of his duties. 28 U. S. C. § 2679(d). Nevada law contains analogous provisions. See Nev. Rev. Stat. §§ 41.032, 41.0335–41.0339 (1996 and Supp. 1999). The employee who successfully claims official immunity therefore invokes the immunity of the sovereign. When a state or federal official asserts qualified immunity, he claims that his actions were reasonable in light of clearly established law. *Anderson* v. *Creighton,* 483 U. S. 635 (1987). In those cases, we allow that official to take an immediate interlocutory appeal from an adverse ruling to ensure that the civil proceedings do not continue if immunity should be granted. *Mitchell* v. *Forsyth,* 472 U. S. 511, 524–530 (1985).

In this case, the state officials raised their immunity defenses in Tribal Court as they challenged that court's subject matter jurisdiction. App. to Pet. for Cert. J5–J6, K8, K11–K13; 196 F. 3d, at 1029–1031. Thus the Tribal Court and the Appellate Tribal Court had a full opportunity to address the immunity claims. These defendants, like other

officials facing civil liability, were entitled to have their immunity defenses adjudicated at the earliest stage possible to avoid needless litigation. It requires no "magic" to afford officials the same protection in tribal court that they would be afforded in state or federal court. *Ante*, at 373. I would therefore reverse the Court of Appeals in this case on the ground that it erred in failing to address the state officials' immunity defenses. It is possible that Hicks' lawsuits would have been easily disposed of on the basis of official and qualified immunity.

\* \* \*

The Court issues a broad holding that significantly alters the principles that govern determinations of tribal adjudicatory and regulatory jurisdiction. While I agree that *Montana* guides our analysis, I do not believe that the Court has properly applied *Montana*. I would not adopt a *per se* rule of tribal jurisdiction that fails to consider adequately the Tribes' inherent sovereign interests in activities on their land, nor would I give nonmembers freedom to act with impunity on tribal land based solely on their status as state law enforcement officials. I would hold that *Montana* governs a tribe's civil jurisdiction over nonmembers, and that in order to protect government officials, immunity claims should be considered in reviewing tribal court jurisdiction. Accordingly, I would reverse the judgment of the United States Court of Appeals for the Ninth Circuit and remand the case for further proceedings consistent with this opinion.

JUSTICE STEVENS, with whom JUSTICE BREYER joins, concurring in the judgment.

While I join the Court's disposition of the case for the reasons stated by JUSTICE O'CONNOR, I do not agree with the Court's conclusion that tribal courts may not exercise their jurisdiction over claims seeking the relief authorized by 42

U. S. C. § 1983.[1]   I agree instead with the Solicitor General's submission that a tribal court may entertain such a claim unless enjoined from doing so by a federal court.   See Brief for United States as *Amicus Curiae* 24–30.

The majority's analysis of this question is exactly backwards.   It appears to start from the assumption that tribal courts do not have jurisdiction to hear federal claims unless federal law expressly grants them the power, see *ante*, at 367–368, and then concludes that, because no such express grant of power has occurred with respect to § 1983, tribal courts must lack the authority to adjudicate those claims. *Ante*, at 368 ("[N]o provision in federal law provides for tribal-court jurisdiction over § 1983 actions").   But the Court's initial assumption is deeply flawed.   Absent federal law to the contrary, the question whether tribal courts are courts of general jurisdiction is fundamentally one of *tribal* law.   Cf. *Gulf Offshore Co.* v. *Mobil Oil Corp.*, 453 U. S. 473, 478 (1981) (State-court subject-matter jurisdiction is "gov-

---

[1] As an initial matter, it is not at all clear to me that the Court's discussion of the § 1983 issue is necessary to the disposition of this case.   *Strate* v. *A–1 Contractors*, 520 U. S. 438 (1997), discusses the question whether a tribal court can exercise jurisdiction over nonmembers, irrespective of the type of claim being raised.   See *id.*, at 459, n. 14 ("When . . . it is plain that no federal grant provides for tribal governance of nonmembers' conduct on land covered by [the main rule in] *Montana* [v. *United States*, 450 U. S. 544 (1981)], . . . it will be equally evident that tribal courts lack adjudicatory authority over disputes arising from such conduct").   Cf. *El Paso Natural Gas Co.* v. *Neztsosie*, 526 U. S. 473, 482, n. 4 (1999) ("*Strate* dealt with claims against nonmembers arising on state highways, and 'express[ed] no view on the governing law or proper forum when an accident occurs on a tribal road within a reservation' ").   Given the majority's determination in Part II that tribal courts lack such jurisdiction over "state wardens executing a search warrant for evidence of an off-reservation crime," *ante*, at 357, I fail to see why the Court needs to reach out to discuss the seemingly hypothetical question whether, if the tribal courts *had* jurisdiction over claims against "state wardens executing a search warrant," they could hear § 1983 claims against those wardens.

erned in the first instance by *state laws*" (emphasis added)).[2] Given a tribal assertion of general subject-matter jurisdiction, we should recognize a tribe's authority to adjudicate claims arising under § 1983 unless federal law dictates otherwise. Cf. *id.*, at 477–478 ("[S]tate courts may assume subject-matter jurisdiction over a federal cause of action absent provision by Congress to the contrary or disabling incompatibility between the federal claim and state-court adjudication").[3]

I see no compelling reason of federal law to deny tribal courts the authority, if they have jurisdiction over the par-

---

[2] This principle is not based upon any mystical attribute of sovereignty, as the majority suggests, see *ante*, at 366–367, but rather upon the simple, commonsense notion that it is the body creating a court that determines what sorts of claims that court will hear. The questions whether that court has the power to compel anyone to listen to it and whether its assertion of subject-matter jurisdiction conflicts with some higher law are separate issues.

[3] The majority claims that "*Strate* is [the] 'federal law to the contrary'" that explains its restriction of tribal court subject-matter jurisdiction over § 1983 suits. *Ante*, at 367, n. 8. But *Strate* merely concerned the circumstances under which tribal courts can exert jurisdiction over claims against nonmembers. See 520 U. S., at 447–448. It most certainly does *not* address the question whether, assuming such jurisdiction to exist, tribal courts can entertain § 1983 suits. Yet the majority's holding that tribal courts lack subject-matter jurisdiction over § 1983 suits would, presumably, bar those courts from hearing such claims even if jurisdiction over nonmembers would be proper under *Strate*. Accordingly, whatever else *Strate* may do, it *does not* supply the proposition of federal law upon which the majority purports to rely.

Of course, if the majority, as it suggests, is merely holding that § 1983 does not *enlarge* tribal jurisdiction beyond what is permitted by *Strate*, its decision today is far more limited than it might first appear from the Court's sometimes sweeping language. Compare *ante*, at 369 ("[T]ribal courts cannot entertain § 1983 suits"), with *ante*, at 366, n. 7 ("We conclude (as we must) that § 1983 is not . . . an enlargement [of tribal-court jurisdiction]"). After all, if the Court's holding is that § 1983 merely fails to "enlarg[e]" tribal-court jurisdiction, then nothing would prevent tribal courts from deciding § 1983 claims in cases in which they properly exercise jurisdiction under *Strate*.

ties, to decide claims arising under § 1983. Section 1983 creates no new substantive rights, see *Chapman* v. *Houston Welfare Rights Organization*, 441 U. S. 600, 617 (1979); it merely provides a federal cause of action for the violation of federal rights that are independently established either in the Federal Constitution or in federal statutory law. Despite the absence of any mention of state courts in § 1983, we have never questioned the jurisdiction of such courts to provide the relief it authorizes.[4]

Moreover, as our decision in *El Paso Natural Gas Co.* v. *Neztsosie*, 526 U. S. 473 (1999), demonstrates, the absence of an express statutory provision for removal to a federal court upon the motion of the defendant provides no obstacle whatsoever to the granting of equivalent relief by a federal district court. See *id.*, at 485 ("Injunction against further litigation in tribal courts would in practical terms give the same result as a removal . . ."). "Why, then, the congressional silence on tribal courts? . . . [I]nadvertence seems the most likely [explanation] . . . . Now and then silence is not pregnant." *Id.*, at 487. There is really no more reason for treating the silence in § 1983 concerning tribal courts as an objection to tribal-court jurisdiction over such claims than there is for treating its silence concerning state courts as an objection to state-court jurisdiction.

In sum, I agree with the interpretation of this federal statute that is endorsed by the Solicitor General of the United States.

---

[4] The authority of state courts to hear § 1983 suits was not always so uncontroversial. See, *e. g.*, Note, Limiting the Section 1983 Action in the Wake of Monroe v. Pape, 82 Harv. L. Rev. 1486, 1497, n. 62 (1969) ("State courts have puzzlingly hesitated on whether they have jurisdiction over § 1983 claims as such, and no case has been found in which a state court granted relief under the section. In one case a state supreme court adopted the expedient of disavowing a position on jurisdiction while denying recovery on the merits").